## RICHARDSON *v.* TRAVER.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

Submitted November 14, 1884.—Decided December 8, 1884.

H & M, being owners in common of a tract of land covered by a mortgage to D, from whom they purchased, agreed to partition, H taking tract 1, M taking tract 2, and tract 3 being subdivided between them. M agreed to assume the mortgage to D, and that H should take his portion free from the encumbrance. M sold his interest to Y, who borrowed from R through his agents to make the purchase, mortgaged his interest in tract 2 to secure the money borrowed, and agreed to apply the money borrowed to obtain a release of tract 2 from the mortgage. Instead of doing it he obtained with it a release of tract 3. Subsequently with money obtained from sale of lots in tract 3, and with other money advanced by them, R's agents acquired the notes secured by his mortgage : *Held,* That under all the circumstances of this case, this was to be regarded as a payment of the mortgage notes, and that R as against H was not entitled to be subrogated in the place of D, with the right to enforce the mortgage against tract 2.

This was an appeal from a decree in equity of the Circuit Court of the United States for the Northern District of Illinois. The facts which make the case are stated in the opinion of the court.

*Mr. Frederic C. Ingalls* for appellant.

*Mr. A. McCoy* for appellee.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

The facts, as shown by the testimony in this case, are these: On or about the 19th of December, 1870, Henry J. Traver, the appellee, and Michael Traver, his brother, bought of John

Dickson a tract of land in the city of Chicago, containing about sixteen acres. They paid to Dickson at the time a small part of the purchase money in cash, and for the balance gave their four joint notes, each for the sum of $5,373.67½, payable respectively in two, three, four and five years from date, with interest semi-annually at the rate of eight per cent. per annum. The notes were secured by a deed of trust of the property to Enos Ayres, trustee. After the purchase they laid the property off into blocks and lots, making three blocks, numbered one, two and three respectively, and subdividing each block into lots. Previous to September, 1872, Michael Traver, who lived in Chicago and had the immediate charge of the property, sold some of the lots, partly for cash and partly on credit. On the 5th of September, 1872, an oral agreement was entered into between the two Travers by which Michael was to take all the cash and notes that had been received from sales, and all the unsold parts of block two, and all but eight lots of those unsold in block three, pay the debt to Dickson, and give Henry all of block one and eight lots in block three, clear of the encumbrance of the trust deed to Ayres. In part execution of this agreement Michael at the time conveyed to Henry his interest in block one and in the eight lots in block three. Henry did not convey to Michael until December 20, 1872. On that day, for the consideration of $100, as expressed in the deed, he remised, released, sold, conveyed and quit-claimed to Michael in fee simple, all his "right, title, interest, claim and demand" in the unsold lots in block two and in block three, except the eight which had been conveyed to him by Michael, and, at the same time, transferred to Michael all his interest in the moneys and securities which had been received for the lots sold. In his deed making the conveyance he covenanted that he had "not made, done, committed, executed or suffered any act or acts, thing or things, whatsoever, whereby, or by means whereof, the above-mentioned premises, or any part or parcel thereof, now are, or at any time hereafter may be, impeached, charged or encumbered in any way or manner whatever."

Michael finding himself unable to pay the note to Dickson which fell due in December, 1872, and the interest on the other

notes, entered into an oral agreement with James C. Hyde by which Hyde was to take the property off his hands as he took it from Henry, and pay the debt to Dickson, and relieve the premises conveyed to Henry from the lien of the trust deed to Ayres. Under this agreement Michael conveyed the part of the property, to which he held the title, to Hyde by deed, with full covenants of warranty expressing a consideration of $16,-000, and transferred to him all debts due for lots sold. This deed was dated December 28, 1872, but the transaction was not finally ended until some days after that date. Hyde at the same time assumed orally the payment of the Dickson debt, that being the only consideration for the transfer. At the time of this transfer Hyde borrowed from Richardson, the appellant, through Hammond & Bogue, his agents in Chicago, $10,000, for which he executed two notes, payable three years from date, one for $6,000 and the other for $4,000, and secured them by two deeds of trust to Hammond as trustee, each upon different parts of block two. Together these deeds covered the whole of the block. Hammond & Bogue were only authorized to make loans for Richardson on unencumbered property. They knew at the time they paid the money over to Hyde that block two was encumbered by the deed of trust to Ayres, but Hyde promised to pay the past due note and the past due interest to Dickson out of the money he borrowed, and obtain a release from Ayres of that block. Hyde did pay the note and the interest past due and also the note falling due in December, 1873, but instead of getting a release from Ayres of block two, he, without the knowledge of Hammond & Bogue, took one of block three, thus leaving block two still under the encumbrance of a lien prior to that for the benefit of Richardson to the extent of the two notes to Dickson falling due four and five years from date.

When the note maturing in December, 1874, fell due, Hyde was unable to meet it, but in January, 1875, he sold nineteen lots in block two, for which he received $6,000 in cash. With this and other moneys advanced by Hammond & Bogue, Bogue went to the bankers to whom both the remaining Dickson notes had been sent for collection, and paid the money for

them and took them away uncancelled, they having been previously indorsed in blank by Dickson, that falling due in 1875 being "without recourse." One payment of $6,000 was made on the 15th of January, and the other, being $5,641.87, on the 29th. On the day the last payment was made, and after the notes had been taken up, Bogue went to Ayres with them and requested him to release block two from the lien of the trust deed to him. He stated to Ayres that he was the owner of the notes, and thereupon Ayres executed a release of block two, which Bogue signed and acknowledged with him. In this release Bogue is described as the " legal holder of the unpaid notes." After this Hyde paid Hammond & Bogue the money they had advanced to take up the notes from the bank. Hammond, also, at different times, released a part of the lots in block two from the lien of the deed of trust to him for the security of Richardson. The nineteen lots which had been sold, and from the proceeds of which the $6,000 came that was paid to the bank upon the notes on the 15th of January, were released when that sale was made. The other releases were executed when the advances of Hammond & Bogue were repaid by Hyde.

Henry J. Traver first heard of the release of the lien on block two under the trust in favor of Dickson a short time before the 5th of April, 1875, and at that date he brought suit in the Circuit Court of Cook County against Michael Traver, Hyde, Bogue, Ayres, Hammond, and others who had become interested in the property, not, however, including Richardson, to obtain a release of block one from the lien under the Ayres trust deed, on the ground that the Dickson notes had been paid. In this suit he obtained a preliminary injunction restraining Hyde, Bogue, and Ayres from enforcing the trust deed or selling or disposing of the two Dickson notes. On the 30th of June, 1875, while this suit was pending, Hammond & Bogue sent Richardson, in Boston, where he resided, a draft for $400 " in paym't of coupon of James C. Hyde due 28th inst. to 1st prox." In their letter to Richardson enclosing the remittance Hammond & Bogue made no mention of any change in the form of his securities, or of the suit which had been

begun by Henry J. Traver. On the 7th of October, 1875, Hyde and Hammond & Bogue answered the bill of Traver, and on the 8th Ayres filed his answer. In the answer of Hammond & Bogue they state that "on or about the time when the first of said two Dickson notes became due, the said Hyde requested these defendants to allow him to pay up said notes for $6,000 and $4,000 then held by said Richardson, and to purchase the said two Dickson notes. And these defendants, acting as the agents of said Richardson, at the request of said Hyde, agreed to and did receive payment of said $6,000 and $4,000 notes, secured by the deeds of trust to this defendant Hammond on said block two, and this defendant Hammond released the greater portion of said block two from the lien of said trust deeds, made to this defendant Hammond as trustee, there being about ten lots yet remaining not formally released, but this defendant Hammond was and is ready to release the same at any time at request of said Hyde, unless enjoined by the court. And the said Hyde, having paid up the interest on said two Dickson notes and a sufficient amount of the principal to reduce the same to the sum of ten thousand dollars, these defendants agreed to and did take said notes by purchase, acting for and in behalf of said Richardson, and the said Richardson is now the legal and equitable owner of the same for full value. And these defendants, as such agents, consented to extend the time of payment of said Dickson notes first becoming due for the period of one year. And these defendants, also at the request of said Hyde, consented to the release of said block two from the lien of said trust deed to said Ayres as trustee, and this defendant, Bogue, signed said release, joining with said trustee, but these defendants at that time supposed and believed that said Hyde was the owner of both block one and block two, and knew nothing of the said agreement between said complainant [Henry Traver] and said Michael Traver, and between said Michael Traver and said Hyde. And these defendants, for and in behalf of said Richardson, extended the time of payment of said Dickson note, first payable, for the term of one year; and the said Dickson notes are now in the hands and possession of these defendants

as the agents of the said Richardson, who is the legal and equitable owner of the same, and who paid full value therefor."

The answer of Hyde was in substance the same.

On the 8th of December following, Hammond & Bogue wrote Richardson as follows:

"With regard to the Traver loan, we have to say, from present appearances we do not think there is a prospect of any payment being made at present.   But we are of opinion it will be for your interest to institute prompt proceedings to foreclose if nothing is paid.   The security on this loan was modified by us from the form as originally taken, as follows: At the time of negotiating for the loan there was existing a prior purchase-money security of the same character as that taken by us.  Our first arrangement, at the time of the negotiation of the loan, was to have this original encumbrance released, in order that your loan should be a first lien.   Instead of the release we had the original security (being the purchase-money paper secured by deed of trust) transferred to us, for your account, in substitution of the security first taken, and which we hold for your security as a first and prior lien, and we think it advisable, in case no payment is made this month when the payment is due (December 19th), that proceedings for foreclosure in the United States court be commenced immediately. We are legally advised and believe that this course will result in procuring an early settlement, but if not, it will be a speedy proceeding by which a final result may be reached much sooner than is the case in the other courts.  We would like you to advise and direct us in regard to immediate proceedings to foreclose as we may deem necessary for our interest.   An early reply is important.  Send all papers of both loans."

Richardson at once sent forward the two notes and deeds of trust, and their receipt was acknowledged by Hammond & Bogue under date of the 13th of December.

On the 28th of December suit was begun by Richardson in the Circuit Court of the United States for the Northern District of Illinois, against the Travers, Ayres, Hammond, and certain purchasers of the property, to enforce the lien of the

Ayres deed of trust on block one for the security of the two Dickson notes. In the bill Richardson stated that "on or about the 15th of January, 1875," he had, "for a good and valuable consideration, purchased from the said John Dickson the two notes aforesaid." Thereupon, Henry J. Traver filed a supplemental bill in his suit in the State court, under which he brought in Richardson as a party. Richardson appeared, and, on his petition, the case was removed to the Circuit Court of the United States for the Northern District of Illinois. When it got there it was consolidated with the suit which had been begun by Richardson. The Circuit Court, on final hearing, dismissed the bill of Richardson and rendered a decree in favor of Traver, cancelling the lien of the deed of trust to Ayres on block one. From that decree Richardson has appealed.

After a careful consideration of the evidence we are satisfied with the decree below. To our minds it is clear that the Dickson notes have been *paid* by Hyde, not *bought* by Richardson. Richardson never heard of the transaction in reference to the Dickson notes until nearly a year after it occurred. He held all the time his original notes and the deeds of trust which were given for their security. Long after the time when it is claimed the notes were paid Hyde, through Hammond & Bogue, remitted him the interest when it fell due according to the terms of the notes he had in his own hands, and did not intimate in any way that those notes had been paid and others substituted for them. The books of Hammond & Bogue contain nothing to connect Richardson with the taking up of the Dickson notes. The $6,000 which Hyde handed to Bogue, and which he used in taking up the notes on the 15th of January, was neither entered to the credit of Hyde nor Richardson. In fact, it nowhere appears in any account on the books. The $5,641.87 which Hammond & Bogue did advance was charged directly to Hyde, and his payments on that account were passed to his credit. In all the conversations with Bogue which have been testified to, he did not intimate that Richardson was the owner of the notes. It is no doubt true the parties supposed that by keeping the notes uncancelled they might be so used as to make the lien under the Ayres trust

on block one available as additional security for the ultimate payment of the Richardson notes, but as Hyde, not Richardson, paid the bank for them, if Hyde could not charge Henry Traver's property with their payment Richardson cannot. Michael Traver bound himself to Henry to pay the notes and discharge block one from the lien of the trust created for their security. Hyde bound himself to Michael Traver to carry out this agreement which had been made with Henry. When the notes were afterwards taken up from the bank, where there were sent for collection, with the money of Hyde, they were, in legal effect, *paid*, and from that time the lien on block one was discharged. Hyde could not himself enforce them against that property, neither can Richardson. Although Hammond & Bogue advanced a part of the money to take up the notes, it was afterwards repaid to them by Hyde, and that made all the money paid for the notes his own. Hyde, Hammond and Bogue all swear, with more or less directness, that Hyde paid the Richardson notes, and that this money was used to buy the Dickson notes, but this is contradicted by the well-established facts in the case, and it is apparent, from their own testimony, taken as a whole, that, until long after the Henry Traver suit was begun, they had no idea that they were doing anything more than keeping the Dickson lien alive as additional security for Richardson. The testimony satisfies us beyond doubt that both Hammond and Bogue knew all about the obligation of Hyde to discharge the lien of those notes on block one, and that the pretence of a payment of the Richardson notes, and the use of the money so paid to buy them, was all an afterthought. There is not a single act or fact which appears in the transaction to indicate that anything of the kind was in the minds of the parties at the time.

It is said, however, that parol evidence of the agreements between Henry and Michael Traver, and between Michael Traver and Hyde, is not admissible, because the " agreements were contradictory to the acknowledgments, and in opposition to the plain import of the covenants contained in the deeds. If, by possibility, they could be held as of force between the

original parties, they were ineffective and nugatory as to third parties."

Neither Michael Traver nor Hyde deny that the parol agreements were made precisely as charged in the Traver bill, and it is elementary learning that evidence may be given of a consideration not mentioned in a deed, provided it be not inconsistent with the consideration expressed in it. 1 Greenl. Ev. 286; 2 Phil. Ev. 353. In both these deeds a valuable consideration is expressed, and it is not inconsistent with the considerations so expressed to show, that the actual considerations were the agreements to pay the Dickson notes. The question here is not as to the liability of Henry J. Traver or Michael Traver upon the covenants in their respective deeds. Undoubtedly their covenants, such as they are, run with the land, but Richardson is not now claiming under the conveyances. The title, if any, which he has to the land embraced in those conveyances is not now disputed. He is suing to collect the Dickson notes, by enforcing their lien on property not included in his original security, and the question in the case is whether they have been paid, and in that is involved the further question, whether Hyde, through whom he got the notes, was bound to pay them. To show that Hyde was so bound, his agreement to that effect, as the consideration for the conveyance to him, was proven. As Richardson does not, in this suit, claim anything under that deed, the covenants cannot be used as an estoppel in his favor. The actual facts may therefore be shown.

It is also claimed that "Richardson is entitled to hold the Dickson security by way of subrogation." But relief is not asked, either in the bill of Richardson or in his answer to the Traver bill, on that account. In both his bill and answer he puts his claim entirely on the ground of the purchase and ownership of the Dickson notes, and makes no mention whatever of his original loan to Hyde, or of the security which was taken therefor. In the answers of Hammond, Bogue and Hyde it is distinctly stated that Richardson's notes were paid, and the Dickson notes bought with the money realized by this payment. Hammond & Bogue having advanced part of the

money to take up the notes, could undoubtedly have held them to secure the repayment of their advances; but, as that repayment has been made, the case stands precisely as it would if Hyde had himself furnished the money originally.

But if relief had been asked on the ground of subrogation, it could not have been granted on the facts as they now appear. The notes were paid by Hyde under his obligation for that purpose, and that discharged the security on block two as well as on block one. The question is not whether, if the notes had not been paid by Hyde, and Dickson were now endeavoring to enforce his security, Richardson could require him to exhaust his lien on block one before coming on block two; nor whether, if Richardson's security on block two had been diminished by a compulsory sale of that block for Dickson's benefit, he could resort to block one to make good his loss; but whether, having voluntarily released his security on block two, without the consent of or notice to Henry Traver, to enable Hyde to raise the money to take up the notes, he can hold the notes with a lien on block one in place of the security he gave up. The doctrine of subrogation, which is a creature of equity, has never been carried to that extent. If Richardson had in good faith paid the notes with his own money to protect himself under his junior security, he would have been put in the place of Dickson as the owner of the notes, and, upon a foreclosure, his rights in block two as against those of Henry Traver in block one could have been ascertained and protected. But such is not the case. His agents and trustee saw fit, without consulting Henry Traver, to allow Hyde to use block two to pay the notes. This block Hyde owned subject to the liens, 1, in favor of Dickson, and, 2, in favor of Richardson. As against Hyde, Henry Traver had the right to have block two sold to pay the Dickson debt before block one was resorted to, because Hyde was bound to pay the Dickson debt and release block one from encumbrance on that account. Whether, as against Richardson's junior encumbrance on block two, Traver could require Dickson to sell that block before coming on block one, depends entirely on the effect of Henry Traver's covenants in his deed of release and quit-claim to Michael, about which we

express no opinion, because to our minds it is clear that Richardson, by voluntarily releasing, without the consent of Henry Traver, a part of his junior security on block two to enable Hyde to raise the money to discharge the debt to Dickson, was not subrogated to the rights of Dickson under his original security on block one. If Traver had been consulted and had consented to the keeping alive of the Dickson notes to take the place of the security of Richardson which had been released, the case would have been different, but as property bound for the Dickson debt was in fact used to pay it with the consent of the junior encumbrancer, no lien upon other property for the security of the Dickson debt can be kept alive for the benefit of the releasing junior encumbrancer without the consent of those whose interests in the other property are to be affected. The payment to Dickson discharged the debt and all that pertained to its continued existence.

*Decree affirmed.*