MISSOURI DIST. TELEGRAPH CO. v. MORRIS & CO.

(Circuit Court of Appeals, Eighth Circuit. April 12, 1917.)

No. 4771.

1. EVIDENCE ☞419(11)—PAROL EVIDENCE TO VARY WRITING—NATURE OF CONSIDERATION.

Where defendant installed in plaintiff's plant a watchman telegraph signal, fire-alarm boxes, and fire-alarm register circuits, with necessary connections, and the contract under which they were installed disclosed the service to be performed by defendant in connection with the watchman's signals in detail, but was silent as to defendant's services with reference to the fire-alarm register, except that defendant agreed to install it, parol evidence was admissible that, as an additional consideration for the contract, defendant, upon receipt of the fire alarms at its central office, was to transmit them to gongs with which it was connected in plaintiff's engine room and the room occupied by its private fire department, as parol evidence may be introduced to show that the consideration stated in a written instrument was not all of the consideration.

2. CONTRACTS ☞170(2)—CONSTRUCTION BY PARTIES.

Where defendant, in carrying out the contract, did transmit alarms to the engine room and fire hall, and without such service the fire-alarm register would have been worthless, this was a part of its duty under the contract, as contracts must be construed in accordance with the construction given them by the parties themselves in acting under them.

3. ESTOPPEL ☞78(1)—OMISSIONS FROM CONTRACT—RETENTION OF CONTRACT.

Plaintiff, by accepting and retaining possession of a triplicate copy of the contract for over two years, without objecting that it did not contain all of the terms intended to be incorporated therein, was not estopped from claiming that it did not express the full agreement of the parties, where it received at all times from defendant the services for which it claimed it contracted.

4. ESTOPPEL ☞78(1)—OMISSIONS FROM CONTRACT—PERFORMANCE.

Defendant was estopped from contending that it was not bound to transmit such fire alarms where, during all of the time it was operating the fire alarm system, it performed such services without objection, since it was its duty to make the objection immediately after the contract was executed.

5. DAMAGES ☞23—BREACH OF CONTRACT—DAMAGES WITHIN CONTEMPLATION OF PARTIES.

Where defendant installed a fire-alarm system in plaintiff's plant, and contracted upon receipt of fire alarms at its central office to transmit them to plaintiff's engine room, the recovery of damages for its negligent failure to so transmit a fire alarm could not be defeated on the theory that it had no notice that plaintiff would not maintain at all times sufficient water pressure to fight fires, and that it was not within the contemplation of the parties that plaintiff would rely upon notice from defendant to increase water pressure in its fire lines, or would suffer damage by the engineer's failure to increase such water pressure.

6. EVIDENCE ☞588—CONCLUSIVENESSS ON JURY.

Where, in support of its contention that such damages were not within the contemplation of the parties, defendant's witness, under whose supervision the gong was placed in the engine room, testified that he did not know what it was placed there for, or what the gong was placed in the fire hall for, the jury was not bound to accept such testimony, as the logical deduction therefrom was that defendant did not know why it transacted any business at all with plaintiff.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
243 F.—31

7. DAMAGES ☞188(3)—EVIDENCE—CONSEQUENCES OF NEGLIGENCE.

In an action for a fire-alarm company's negligent failure to transmit a fire alarm received at its central office to plaintiff's engine room, resulting in the engineer failing to supply sufficient pressure to fight the fire, where there was abundant evidence to sustain a finding that, if the engineer had been promptly notified of the fire, he would have been able to furnish sufficient pressure to extinguish the fire while it was confined to the motor box in which it originated, and no damages were allowed for the destruction of the motor box, the damages were not so speculative and dependent upon changing, uncertain, and undeterminable contingencies as to defeat a recovery.

8. TRIAL ☞192—INSTRUCTIONS—STATEMENT AS TO UNDISPUTED FACTS.

Where the contract between the parties was silent as to the services to be performed by defendant in connection with its fire-alarm system, and when the charge was given every one connected with the trial knew that the written instrument did not contain the complete contract between the parties, the court committed no error in so telling the jury.

9. APPEAL AND ERROR ☞1062(4)—HARMLESS ERROR—SUBMISSION OF QUESTIONS OF LAW.

Though, as there was no dispute as to the real consideration moving from defendant to plaintiff for such contract, it might not have been error for the court to tell the jury that the transmission of such fire alarms should be considered a part of the consideration, the submission of this question to the jury was not error of which defendant could complain, where they found the contract to be just what the court would have been obliged to tell them it was, especially where the jury were required to determine the specific issue as to whether the want of water pressure was caused by the failure to receive the requisite notice from the defendant, and whether, if the pressure had been sufficient, the fire could have been confined to the motor box in which it originated.

10. NEGLIGENCE ☞136(26)—CONTRIBUTORY NEGLIGENCE—QUESTIONS FOR JURY.

The question of contributory negligence is usually one of fact for the jury.

11. WITNESSES ☞237(4)—EXAMINATION—QUESTIONS ASSUMING FACTS.

In an action against a fire-alarm company for failure to transmit a fire alarm to plaintiff's engine room, where a witness testified that when he first discovered the fire it was confined to a motor box, a question asked him as to how long it was after he got back up to the motor box before the fire spread to a leaf-lard cooler, was not objectionable as assuming without testimony, and in the face of the physical facts, that the fire originated in the motor box.

12. APPEAL AND ERROR ☞501(4)—RECORD—PRESENTATION OF EXCEPTIONS.

A contention that the court in its charge assumed a fact cannot be reviewed where it does not appear from the record that any exception was taken to such statement.

13. EVIDENCE ☞131—ADMISSIBILITY—CONDITIONS AFTER INJURY.

In an action against a fire-alarm company for negligent failure to transmit a fire alarm to plaintiff's engine room, resulting in the engineer failing to furnish sufficient water pressure, there was no error in admitting evidence of a test of the water pressure just prior to the trial, where the evidence tended to show that the conditions were the same and plaintiff had offered to let the defendant make the test itself at plaintiff's expense.

14. EVIDENCE ☞183(2)—SECONDARY EVIDENCE—ADMISSIBILITY OF EVIDENCE OF DESTRUCTION OF PRIMARY EVIDENCE.

Where defendant's employé, in charge of its central office, testified as to what he read upon the tape on which the fire alarm was registered, it was not error to admit his testimony that he burned the tape, as the record

thereon was the original and best evidence of the fire alarm, and it was proper to show its destruction in order to make the testimony of the witness competent.

15. DAMAGES ☞214—INSTRUCTIONS—REDUCTION OF DAMAGES.

In such action, the instruction given by the court on the question as to plaintiff's duty to notify the engine room by means of a push button and buzzer installed by itself *held* as favorable to defendant as it could ask.

16. CONTRACTS ☞275—PERFORMANCE—DEGREE OF CARE REQUIRED.

Where defendant installed a fire-alarm system in plaintiff's plant, and agreed upon receipt of fire alarms to transmit them to defendant's engine room and fire hall, defendant was only required to exercise ordinary care, but the care to be exercised must be considered with reference to the surrounding circumstances, and, as any service but prompt service would be worthless, prompt service was required.

In Error to the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

Action by Morris & Co. against the Missouri District Telegraph Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Percy B. Eckhart, of Chicago, Ill., and P. E. Reeder, of Kansas City, Mo. (Albert T. Benedict, of New York City, and Edwin Camack, Maurice H. Winger, and New, Miller, Camack & Winger, all of Kansas City, Mo., on the brief), for plaintiff in error.

M. W. Borders, of Chicago, Ill., and Frank P. Sebree, of Kansas City, Mo. (Borders, Walter & Burchmore, of Chicago, Ill., and Sebree, Conrad & Wendorff, of Kansas City, Mo., on the brief), for defendant in error.

Before CARLAND, Circuit Judge, and RINER and MUNGER, District Judges.

CARLAND, Circuit Judge. Defendant in error, hereafter called plaintiff, sued plaintiff in error, hereafter called defendant, to recover damages resulting from a fire in its packing house at Kansas City, Kan., which damages it is alleged were caused by the negligence of the defendant. The plaintiff recovered a verdict, and the defendant has brought the case here assigning error.

At the commencement of the trial in the court below counsel for defendant moved the court orally for judgment in its favor upon the pleadings. The grounds of the motion were (a) that the written contract set forth in the complaint did not impose upon the defendant any duty such as was alleged to have been violated by it; (b) that the damages claimed were not the proximate result of the alleged violation of duty; (c) that the damages sustained were so speculative and uncertain as to be impossible of ascertainment. These same questions were subsequently raised by objections to the introduction of evidence, requests to charge, and also by motion for a directed verdict. We prefer to consider the same generally, regardless of how the questions were raised. Looking at the evidence in its most favorable aspect with refer-

ence to the case of the plaintiff, as we are bound to do on a motion for a directed verdict, the following facts appear from the record:

Since 1905 the plaintiff has maintained and operated a packing plant at the city of Kansas City, Kan., and in connection therewith has conducted the business of buying and slaughtering cattle, hogs, and sheep, dressing, curing, and preparing the meat for food, and manufacturing the by-products thereof. The plant consisted of 20 buildings, varying in size from 20 feet by 40 feet to 150 feet by 175 feet. The buildings, with a few exceptions, were six stories high with basement separated by fire walls. Ever since the plant started, in 1905, the plaintiff has maintained a fire department of its own located on the third floor in building No. 12. From five to seven men are employed as firemen. The firemen have a room located as above called the fire hall, in which they sleep at night. The firemen were on duty on holidays and Sundays as well as week days. The department was equipped with a full fire hall equipment. A fire gong was placed therein by the defendant 14 inches in diameter. This gong connects with the central office of the defendant by an electric wire. It has no other connection. There were in the fire hall also a tape register and telephone placed therein by the defendant. The tape register is connected with the central office of the defendant and with no other place.

The plaintiff also maintains in its plant a room called the engine room, about 500 feet south of building No. 11, in which the fire in controversy occurred. The engine room is equipped with ice machines, pumps, and generators. In each corner of building No. 11 were risers or water pipes for fighting fire. Fire hose was attached to these pipes on each floor. These water pipes were connected directly with pumps in the engine room. There was a continuous water pressure of from 20 to 40 pounds maintained in these water pipes. The pumps are connected with the Kaw river and also with the city water system. The risers or pipes spoken of are six inches in diameter. There was no communication from the fire hall to the engine room by telephone. The defendant had installed in the engine room a fire gong and ticker service. The gong was 14 inches in diameter. The ticker service was the same as in the fire hall.

It was the invariable practice of the defendant at 6 o'clock in the morning and at 5:30 o'clock in the evening to test the fire-alarm service thus installed. The plaintiff itself placed in the fire hall and in the engine room a four-inch buzzer bell, so that the fact could be verified as to whether the engine room and the fire hall had received the same notice, when a test was being made. A wire ran from the fire hall into the engine room, which connected these bells or buzzers.

The defendant owns and operates Night Watchman's Telegraph Signal and Fire-Alarm Boxes, also Fire-Alarm Register Circuits. It installs these boxes and fire-alarm register circuits in large manufacturing and mercantile plants, and, for a rental agreed upon, performs a service in connection therewith which has for its only object fire protection. January 1, 1910, defendant entered into a written agreement with the plaintiff as follows:

"That for the consideration hereinafter named, the District Company agrees, at its own expense, to promptly place on the premises of the subscriber at—

|  | Boxes. | F. A. Registers. |
|---|---|---|
| Chicago, Ills. | 172 | 2 |
| St. Joseph, Mo. | 52 | 1 |
| East St. Louis, Ills. | 53 | 1 |
| Kansas City, Kan. | 48 | 1 |

Night Watchman's Telegraph Signal and Fire-Alarm Boxes and Fire Alarm Register Circuits, with all necessary wire connections and other apparatus for the efficient working of the same.

"The District Company further agrees to install such boxes, gongs, and registers as may be ordered by the subscriber, on premises hereafter acquired by subscriber, at prices herein provided for.

"The watchman of the said subscriber shall communicate with the central office of the District Company by means of the said signal boxes, at such intervals during the night, commencing at 6 o'clock p. m., and ceasing at 7 o'clock a. m., Sundays and holidays included, as shall from time to time be determined upon by said subscriber, and by the same reported in writing to the office of the District Company.

"The District Company shall receive the signals of the watchman or other person for the time being in charge of said premises, and record the time when the same shall be so received; and in default of such watchman, or other person in charge as aforesaid, making such signals within ten minutes of the time after said signal is due according to the list then in force between the said parties, and said District Company shall and will forthwith send its roundsman to the premises and ascertain the cause of such failure or neglect of signaling.

"The District Company further agrees to furnish to the said subscriber a daily report in writing, showing the several times at which signals were received during the previous night, and also the excuse or explanation given by the watchman for any failure to signal as aforesaid.

"In case of accident or disability of the watchman of the said subscriber, the said District Company will furnish a temporary watchman, for which a reasonable charge shall be made.

"The said subscriber hereby agrees to pay for such service the sum of eighteen ($18.00) dollars per annum for each combination fire alarm and watch service box; one hundred ($100.00) dollars per annum for each gong and register circuit with one location; and fifty ($50.00) dollars per annum for each additional gong and register location on such circuit, for the period of five (5) years and thereafter until one year's notice has been given in writing by the subscriber of a desire to terminate this contract. Payments to be made monthly.

"Additional boxes will be installed as ordered by subscriber, who hereby agrees to pay for each such added box eighteen ($18.00) dollars per year.

"The said subscriber also agrees to reimburse said District Company for any change or alterations made after installation and approval of same, where such changes are made to accommodate alterations in subscriber's premises.

"This agreement shall be effective as of January 1, 1910, and cancels all agreements heretofore made between the subscriber and any associated District Company for fire-alarm and watch service in the plants herein named.

"It is further agreed that, in the event of the destruction by fire or other casualty of any portion of the aforesaid premises, the rental hereunder shall be reduced in the proportion that said boxes are thereby rendered out of service, at the rate per box provided for by this contract.

"It is further understood and agreed that the said instruments, and all wires and other apparatus hereto, shall be and remain the sole property of the District Company; and the said subscriber hereby authorizes and empowers the District Company, or its agents or assigns, to enter any building and remove the said instruments, provided that the said subscriber shall have failed to pay over to the District Company the stipulated rental monthly

aforesaid, or any other charge for service or expenditures that the said District Company may have been called upon to perform, either by signal or that have accrued under any of the provisions of this contract."

As the name of the boxes indicates, they performed two functions, viz. watchman's telegraph signal described in detail in the above contract and fire-alarm service. To give the fire alarm the watchman or other person, in accordance with permanent directions on the fire-alarm box, would break a glass thereon and turn a certain lever to the right. By so doing the number of the box would be recorded on the same tape that received the watchman's signals in the central office of defendant, but, in place of registering the number of the box once, it would register the number eight times. When a fire alarm was received at the central office from the plant of the plaintiff, it was the duty of the operator of defendant at the central office to throw a switch, requiring but a fraction of a second, and thereby turn the fire-alarm signal back to the plaintiff's fire hall and engine room, the whole operation requiring about thirty seconds. Over the objection of defendant's counsel, plaintiff was permitted to show that defendant had been for five years prior to January 1, 1910, for a rental agreed upon performing watchman's signal and fire-alarm service as above detailed. While this service was being performed as indicated the written contract above set out was executed, there being no change in the manner of service except that instead of the telephone the defendant installed, in connection with the fire-alarm service, a gong and register line in the plant of the plaintiff to connect with its central office.

Laying aside the manner in which the watchman's signals were made and recorded as not being involved in the present action, the manner of receiving and reporting fire alarms was as follows: The defendant's central office was located in a room also occupied by the Western Union Telegraph Company at the Livestock Exchange, Kansas City, Kan. There is a table in the central office on which are placed a series of registers. These registers are electrical instruments that record the number of the box pulled by the watchman in the plant of the plaintiff. There was one register for each plant for which a fire-alarm service was being rendered. At the time of the fire hereinafter mentioned there were about twelve registers.

The register in connection with the fire-alarm service rendered to the plaintiff was connected with the fire hall and engine room of the plaintiff by wire. There was a wire that connected with the watchmen's boxes which permitted the fire-alarm signal to come to the central office, and there was also another wire that connected the central office with the registers and gong in the fire hall and engine room. There was no connection between the plant of the plaintiff and the central office of the defendant for fire-alarm purposes except the wire which operated the gong and register. The gongs in the fire hall and engine room were for the purpose of notifying the fire hall and engine room that a fire-alarm signal was coming. The gongs could not be rung except by the operator in the office of the defendant. The defendant had installed in the plant of the plaintiff 48 of the watchman's telegraph signal and fire-alarm boxes. Under ordinary circum-

stances if a fire alarm would be signaled from one of the boxes in the plant of the plaintiff to the central office, the operator receiving the signal would communicate it to the fire hall and engine room within eight or ten seconds.

On July 7, 1912, one Sheldon, 19 years of age, was the manager and in charge of the central office of the defendant at the stockyards exchange, Kansas City, Kan. He had two employés assisting him in the work, M. O. Williamson and M. W. Allie. They performed the services hereinbefore indicated for about 50 subscribers. The plaintiff was one of them. The ordinary duty of the employés was to place upon large sheets of paper, which had the numbers of the fire-alarm boxes in any particular plant thereon, the time that any particular watchman would pull a box in any particular plant. These reports would be coming in practically all day. On the day in question Sheldon's assistant Allie was absent for the day; Williamson was on duty that day, but at about 12:07 to12:10 o'clock went out for his luncheon. After Williamson left, Sheldon, the only remaining employé, took his lunch and went to a place in the central office 15 or 20 feet from the fire-alarm register. Sheldon did not hear any fire alarm from the time he commenced eating his luncheon.

While Sheldon was eating his lunch, and about 12:22, there came a call from plaintiff's plant over the telephone, which was received by an employé of the Western Union, who told Sheldon that the plaintiff was on the 'phone and wanted to talk about a fire. Sheldon went to the 'phone, and the plaintiff asked if he (Sheldon) got the fire alarm. Sheldon answered, "Yes." That is all there was said on the 'phone. In fact, Sheldon did not know that a fire alarm had been received. He then went to the register to see if a signal had been recorded, and found that while he was away eating his lunch three separate fire-alarm signals had been received from the plant of the plaintiff, and not one of them had been turned back to the fire hall or engine room of the plaintiff. Sheldon then notified the city fire department of Kansas City, Kan., and burned the tape upon which was recorded the fire alarms.

A few minutes after noon of July 7, 1912, Mr. Clark, the motor tender who was looking after the various motors in the plant of the plaintiff, while he was going around to see that they were oiled and in proper condition. went from building No. 10 into No. 11 on the fifth floor to examine a motor, when his attention was directed to smoke coming from a motor box in which was a motor that furnished the power to operate a system of fans in a lard cooler. The box was up against the ceiling and was four feet square. There was no flame discernible at that time. Clark immediately ran to the fire hall, which was on the third floor of building No. 12 adjoining building No. 11. In the fire hall were four or five firemen, and on his way to the hall he was "hollering" fire! The firemen immediately secured their spanners, and followed Clark to the fire. Clark estimated that it took one minute from the time he discovered the smoke until he and the firemen were back at the motor box. Robert Hooper, chief of plaintiff's police, who was coming up the stairway to the fire

hall to eat his lunch, heard Clark cry fire in coming to the fire hall, and he immediately ran to a window and called to his assistant, whom he had left on the loading deck, to pull one of these fire alarm boxes. When Hooper reached the window he saw Henry Haberle, a fireman, turning in a fire alarm through one of the combination boxes of the defendant. The time of giving the first alarm is definitely fixed at 12:00 o'clock and eight minutes by Hooper's watch, and 12:09 by the time of the defendant. Upon reaching the scene of the fire the firemen coupled up 50 feet of hose that reached within 25 to 30 feet of the motor box, but there was no fire pressure in the water pipes, and as a result the water merely ran over the end of the nozzle, not even reaching the motor box. The assistant fireman then immediately ran and turned in another fire alarm. In the meantime the firemen procured 50 feet of hose from another corner of the room, and put it on the first section, and again turned on the water, but there was no pressure. The assistant fireman turned in a third fire alarm. Then one of the firemen climbed up and opened the motor house door, and the smoke and flames shot out. The testimony showed the pumps in the engine room were able to furnish and throw 300 gallons of water per minute 120 feet.

After the second hose was obtained and attached, and there still being no pressure, the assistant fireman ran down five flights of stairs to the engine room, which was distant 650 feet, and notified the engineer of the fire, and, the pumps and apparatus being in good condition, a fire pressure was immediately given; but by this time the smoke drove the firemen out of the room where the fire occurred, some being compelled to go down the fire escape, and others being carried out to avoid suffocation.

There are many other facts in the record which sustain the verdict rendered, but the foregoing statement is deemed sufficient to present the important questions in the case. It is not disputed but that there was ample evidence to sustain the verdict of the jury as to the amount of damage which resulted from the fire if any damages were recoverable. There was also ample evidence to sustain the claim of the plaintiff· that, had the fire-alarm signals which were transmitted to the defendant at its central office been immediately turned back to the engine room of the plaintiff, a sufficient water pressure would have at once been obtained to have extinguished the fire while it was confined to the motor box. No damage was allowed for the destruction of the motor box. The negligence of which complaint is made is, of course, the failure of the operator at the central office of defendant to give the engine room in the plant of the plaintiff immediate notice of the fire alarm, so that sufficient water pressure could be supplied to extinguish the fire.

Turning now to the written contract hereinbefore mentioned, it will be seen that it discloses the service to be performed by the defendant in connection with the watchman's signals in detail. When we come, however, to the service to be performed by the defendant with reference to the fire-alarm register, we find that the contract is silent except as to the fact that the defendant agrees to install a fire-

alarm register. This being the condition of the written contract, counsel for defendant raise the point that the written contract nowhere provides that the defendant should perform the duty which it is alleged the defendant failed to perform.

[1, 2] It is further contended in this connection that parol testimony is not admissible to vary, contradict, add to, or qualify the terms of the written instrument, and the learning upon the question of latent and patent ambiguity has been cited from 1630 (Lord Bacon's Rule 23) to the present time. There is no doubt about the rule, but, as is true of most rules, it has numerous qualifications as well established as the rule itself. Among these qualifications is the one that permits the introduction of parol testimony to show that a written contract was without consideration or that the consideration stated in the written instrument was not all of the consideration. In Richardson v. Traver, 112 U. S. 431, 5 Sup. Ct. 206, 28 L. Ed. 804, it was said: "It is elementary learning that evidence may be given of a consideration not mentioned in a deed, provided it be not inconsistent with the consideration expressed in it." 1 Greenleaf on Evidence, 286; 2 Phillips on Evidence, 353; Mills v. Dow, 133 U. S. 423, 10 Sup. Ct. 413, 33 L. Ed. 717: Fire Insurance Association, Ltd., v. Wickham, 141 U. S. 564, 12 Sup. Ct. 84, 35 L. Ed. 860. The written contract provided that the defendant should install one fire-alarm register circuit in the plant at Kansas City. The inquiry naturally arises, what for? The contract does not specify the purpose of its installation, and mere installation would be worthless unless some service was to be performed in connection therewith. It then becomes material to inquire if there was any other consideration than the mere installation of the register circuit which the defendant was to perform for the annual rental of $18 for each watchman's signal and fire-alarm box, and $100 per annum for each fire-alarm register. It is proven that there was an additional consideration to be given by the defendant by the fact that the defendant performed a service in connection therewith, without which the fire-alarm register would have been worthless. It was competent to show this additional consideration by parol testimony, as it was not inconsistent with the written contract and defendant admits that the service was performed as proven. If the defendant had sued the plaintiff for the $100 rental and the plaintiff had sought to defend by showing that the written contract was void for want of consideration to be performed by the defendant, certainly in such a case the defendant would be allowed to show just what the consideration was as understood and acted upon by both parties to the contract. We have no doubt that parol testimony was competent to show the actual consideration for the contract on the part of the defendant, and that the contract must be construed in accordance with the construction given to the same by the parties themselves in acting under it.

[3, 4] It is next contended that plaintiff, by accepting and retaining possession of a triplicate copy of the original contract in question for a period of over two years, without making any objection that it did not contain all of the terms intended to be incorporated therein, there-

by ratified said contract, and accepted it according to its terms, and is now estopped from claiming that it does not express the agreement of the parties. There is not a single element of estoppel in the conduct of the plaintiff, for it received at all times from the defendant the service for which it claims it contracted. If either party should be estopped it should be the defendant, as during all the time mentioned it performed the service contended for by plaintiff without objection. If the defendant was ever going to say that the contract did not provide for the performance of the service for which the plaintiff was paying, it was its duty to make the objection immediately after the contract was executed or forever after remain silent.

[5, 6] It is next contended that the plaintiff should not be permitted to recover in this case for the reason that the evidence does not disclose that the defendant had any notice that the plaintiff would not maintain at all times sufficient water pressure to fight fire, and it was not within the contemplation of the parties when the contract was executed that the plaintiff would rely upon notice from the defendant to increase the water pressure in its fire lines, or that the plaintiff would suffer damage by reason of the failure of the engineer of the plaintiff to increase the water pressure in its own fire-fighting system. In considering this contention, it must be borne in mind that the whole service rendered by defendant to plaintiff and for which it was paid was to discover fire and prevent the spread thereof after discovery. It would be contrary to the common knowledge and experience of mankind to expect that the plaintiff would at all times keep up a sufficient water pressure to fight fire when there was no fire. It would be contrary to the general practice of fire departments generally. To say that it was not within the contemplation of the parties that the plaintiff would rely upon notice to the engine room so as to increase the water pressure would be to say that the officers and employés of defendant did not know why it placed a gong in the engine room. It is true that the witness Brownson, under whose supervision the gong was placed in the engine room, testified that he did not know or learn what the gong as placed in the engine room for, when it was so placed, and he also testified that he did not know what the gong was placed in the fire hall for. The logical deduction from this testimony is that the defendant did not know why it transacted any business at all with the plaintiff or for what purpose. The jury was not bound to follow such testimony when we consider that the only object for which plaintiff paid the defendant thousands of dollars per annum was fire protection. Conceding, for the sake of argument, that defendant did not know that the plaintiff at all times did not maintain a sufficient water pressure to fight fire, nevertheless it received thousands of dollars annually from the plaintiff for notifying it of the discovery of fire in its plant immediately, as the service was worth nothing unless performed with the utmost promptness. It is not competent, therefore, for the defendant, in the face of undisputed negligence, to say that it did not know for what purpose the plaintiff wanted the service performed. It was the defendant's duty to give the notice; the plaintiff's duty to make such use of it as the circumstances demanded.

[7] It is next contended that the evidence in the case, with respect to the particular point at which the fire might have been stopped in the event the water pressure had been adequate, is indefinite and uncertain, and the damages sought to be recovered are so speculative and dependent upon numerous, changing, uncertain, and undeterminable contingencies that the most the jury could do and did do was to guess at the amount of the damage which might have been occasioned by the failure of the engineer to increase the water pressure; consequently the court should have limited the amount of the recovery in any event to nominal damages. It is true that the defendant did not start the fire that destroyed plaintiff's property, but, contrary to the facts in the telephone cases cited (Volquardsen v. Iowa Tel. Co., 148 Iowa, 77, 126 N. W. 928, 28 L. R. A. [N. S.] 554; S. W. Telegraph Co. v. Thomas [Tex. Civ. App.] 185 S. W. 396; Providence Washington Ins. Co. v. Iowa Tel. Co., 172 Iowa, 597, 154 N. W. 874, and others), there is only one finding which must be made in order to establish the negligence of the defendant as the proximate cause of the destruction by fire of the property for which damages were recovered, and that is the finding that the engineer at the engine room, if he had been promptly notified of the fire, would have been able to furnish sufficient water pressure and extinguish the fire while it was yet confined to the motor box. There is abundant evidence to sustain the finding of the jury upon this question. In this connection it must be borne in mind that telephones are not rented for the special purpose of notifying the lessee of the discovery of fire.

In the Volquardsen Case, supra, the Supreme Court of Iowa said:

"Of course, if the failure to put out the fire was the direct and natural consequence of the unreasonable delay in making the connection (telephone), then there could be no doubt as to defendant's liability."

In the telephone cases it appeared that there were several links in the chain of sequences that were involved in doubt and speculation. In the present case the whole service for which defendant was paid was to notify the plaintiff of the discovery of fire, and the evidence does not leave the question as to whether the engineer of plaintiff, if he had received the notice of fire in time, could have furnished sufficient water pressure to extinguish the fire while confined to the motor, in doubt and speculation.

[8, 9] It is next contended that the trial court committed prejudicial error in submitting the construction of the contract sued upon to the jury, and in instructing the jury that the written instrument dated January 1, 1910, did not contain the complete contract of the parties. At the time the charge was given to the jury every one connected with the trial knew that the written instrument did not contain the complete contract between the parties, and the court committed no error in so saying. As there was no dispute as to what the real consideration moving from the defendant to the plaintiff was, it would not have been error perhaps if the court had stated to the jury that the service actually rendered by the defendant to the plaintiff under the contract should be considered a part thereof. It would have been obliged to say this if it construed the contract itself, but, even if it

be conceded that it was the duty of the court to so state to the jury, still the error, if any, in submitting the question to the jury was not error of which the defendant can complain, because the jury found the contract to be just what the court would have been obliged to tell them it was if he had not submitted the question to them. The jury, moreover, were not given a roving commission to create a contract upon guess or conjecture, for the reason that the court submitted the specific issue to the jury as to whether or not the want of water pressure was caused by the failure to receive the requisite notice from the defendant, and as to whether if water pressure had been sufficient the fire could have been confined to the motor box.

[10] It is next contended the court should have directed a verdict for the defendant because all the evidence offered by the plaintiff disclosed as matter of law that the damage claimed to have been sustained by it was caused and directly contributed to by its own negligence and that of its agents and servants. In regard to this contention it is clear that the facts in evidence were not such as would have allowed the court to decide as a matter of law that the plaintiff was guilty of contributory negligence. The question of contributory negligence is usually a question of fact for the jury, and it cannot be said that all reasonable men would have decided that the plaintiff was guilty of contributory negligence, when under a proper charge 12 men have already said that it was not. Upon this question it also may be remarked that plaintiff paid many thousands of dollars per annum under the written contract so as to be notified of the discovery of fire in its plant, which was the business the defendant was engaged in, and the contract between the parties. The plaintiff had a right to rely upon and receive such notice at the engine room and fire hall. Its fire department and its fire equipment was of no value or use unless this service was promptly performed by the defendant. When the service that was to be performed promptly by the defendant and upon which plaintiff relied failed, it is not strange that there was some delay or want of prompt action in turning to other means for putting out the fire. Defendant cannot be heard to criticize the acts of the plaintiff in putting out the fire too severely when these acts resulted from the failure of the defendant to perform its duty towards the plaintiff.

It is next contended that the burden of proof was on the plaintiff to show by a preponderance of the evidence that it was the negligence of the defendant, and not its own negligence, or that of its servants, inevitable accident, or some other cause, which was the proximate cause of the damage; and the court should have directed a verdict for the defendant because, under all of the evidence, the jury was compelled to and did render a verdict based solely upon guesswork, speculation, and conjecture as to the proximate cause of the damage. This contention needs but little consideration. It is, of course, true that the burden of proof to show negligence was upon the plaintiff and the jury were so told. The amount of the damages was not contested seriously. The evidence in regard to the negligence of the defendant was undisputed, and the real question for the jury was as to whether, if the engineer had received the fire notice as it was delivered to the de-

fendant, he could have furnished sufficient water pressure to extinguish the fire while confined to the motor box. The evidence upon this question was not a matter of guess or speculation, but there was direct testimony upon which the jury could find the fact.

It is next contended that the court erred in permitting witnesses to testify upon the assumption that the fire spread from the motor box to the lard cooler, and in assuming in his charge to the jury that the fire originated in the motor box and spread from the motor box to the lard cooler, without any testimony in support thereof, and in face of the physical facts disclosed by the evidence that the fire actually did originate in the walls of the lard cooler. When the question was put to the witness Hooper which assumed that the fire spread from the motor box to the leaf-lard cooler, an objection was made by defendant that it was assuming a fact not proven. This objection was sustained.

[11, 12] The witness Clark when upon the stand was asked the question: "Mr. Clark I wish you would give the jury your best recollection as to how long it was after you got back up to the motor box before the fire spread to the leaf-lard cooler." Answer: "Within eight or ten minutes." This question was objected to as leading, suggestive, calling for a conclusion, and assuming something not shown. The objection was overruled, and an exception taken. But Clark had already testified, without objection, that when he first discovered the fire it was confined to the motor box, so that it was not objectionable to ask Clark how long after he got back to the motor box was it before the fire spread to the leaf-lard cooler. There was no error in this ruling. In regard to the court assuming in its charge that the fire started in the motor box, it does not appear from the record that there was any exception taken to such statement.

[13] It is next contended that the court erred in admitting any evidence or proof of the test of the water pressure made just prior to the trial, which testimony was given by the witnesses Willard and Mercier. We see no objection to the admission of this testimony. American & English Enc. of Law, vol. 12, pp. 401, 402. The evidence tended to show that the conditions when the test was made were the same as when the fire occurred, and the plaintiff offered to let the defendant make the test at the expense of the plaintiff and report the same thereof to the court and jury, and the offer was refused.

[14] It is next contended that the court erred in admitting the testimony of the witness Sheldon to the effect that he burned the tape in the central office which registered the fire call sent in from the plant of the plaintiff at the time it is claimed the fire was discovered. It is urged that such testimony tended to inflame and arouse the passion and prejudice of the jury against the defendant. The record made on the tape by the register was the original and best evidence of what the fire alarm was, and it was proper to show the destruction of the original and best evidence in order to make the testimony of the witness competent as to what he read upon the tape when he went to the instrument after eating his luncheon.

[15] It is next contended that the court erred in refusing to give the following instruction to the jury:

"The court instructs the jury that if you find from the evidence that prior to July 7, 1912, the plaintiff installed an electrical gong or bell in the engine room of the plant connected with a push button in the fire hall, and promulgated a rule to the firemen and employés in the engine room that in case of a fire that the firemen should push the button in the fire hall and ring said bell in the engine room for the purpose of notifying the employés in the engine room to turn on fire pressure, and that upon the ringing of said bell it was the duty of the employés in the engine room to increase the water pressure on the fire line for the purpose of fighting fire, then your verdict must be for the defendant."

The court in its charge, in reference to the buzzer in the hall and engine room operated by a push button, charged the jury as follows:

"Now, then, in view of the law as thus stated let us consider the push button arrangement and small gong between the fire hall and engine room. You will recall that fire pressure was one hundred and twenty-five pounds. It is contended on behalf of the plaintiff that this gong was used only in testing the apparatus, and when pressure was to be put on for some comparatively unimportant purpose; such pressure as, according to the witness Norman, an engineer, would not exceed seventy pounds, and which would not require the engineer to stop the machinery and throw all pressure into the fire mains, as was the procedure in case of fire. Witnesses for the defendant claim that this push button and gong were used and to be used in case of actual fire and in blind tests. If you find the situation to be as contended for by the plaintiff in this regard, then this special line would cut no important figure in this controversy in any event. If you find it to be as the defendant claims, and as just stated, then you have still a further matter to consider. Concededly, whether for tests or more important purposes, this line between the fire hall and the engine room was installed by the plaintiff itself entirely apart from and disconnected with the fire-alarm system installed by the defendant company. You will determine to what extent plaintiff intended it to supplement and aid the latter system, if at all; but this fact appears practically without dispute as the court recalls it; when a box was pulled for fire, and an alarm sent into the central office of the Missouri District Telegraph Company, the practical operation of the system caused that alarm and notification to be sent back immediately, and within a few seconds, to the engine room of the plaintiff; the big gong was rung and the number of the box registered. Then, so engineer Norman says, and he is corroborated by other witnesses, under the rules the engineer blew the whistle three times, dipped the lights throughout the plant, shut down the machinery to the extent of throwing all pressure into the fire mains to bring that pressure and maintain it, so nearly as might be, at one hundred and twenty-five pounds, drain the ammonia pipes, and cut off electrical connections in the building involved. He needed no other sign or signal to impose upon him the duty to do all this; whatever other checks or balances there may have been in that plant, they could not make his duty more imperative, nor could they relieve the defendant from the duty of giving this notice to the engine room, if you find that was a part of the contract duty. In other words, the defendant had no right to exact from the plaintiff the duty to provide other means to supply the place of those provided by the defendant in case the latter failed. You are also to consider then whether, under the conditions there existing, in case of actual fire, it was deemed essential to get pressure to push the button in the fire hall, and whether, under the circumstances and conditions there existing, ordinarily careful men summoned to the fire in haste by messenger, with no alarm turned in from the defendant company, might not, in reason, have neglected to press the button to the engine room, if you find that such a proceeding under such circumstances was usual, but not absolutely essential."

We are of the opinion that the court in its charge stated the true rule to the jury for its guidance and in as favorable a manner as the defendant could ask.

[16] In conclusion, it may be said that the defendant contracted with the plaintiff for a certain service which had for its sole object the extinguishment of fire in its inception. The plaintiff paid for such service in all its plants $6,350 per annum. The very nature of the service demanded the utmost promptness in its discharge. While the care to be exercised by defendant would be called ordinary, still the care to be exercised must be considered with reference to the circumstances surrounding the performance of the duty imposed. What would be ordinary care under certain circumstances would not be ordinary care under different circumstances. Any service but prompt service would be worthless, so prompt service was required. The jury found that the negligence of the defendant was the proximate cause of the damage suffered by the plaintiff. The defendant must be held to have known the dangerous character of fire when uncontrolled, and must be held to have known that it would cause large damage in the plant of the plaintiff if allowed to spread. With all this knowledge it contracted with the plaintiff to notify it in the way indicated, if fire should be reported to its central station. We see no reason why the defendant should not be held liable for damages which were the proximate result of its negligence.

The judgment below is affirmed.