**HARTZELL v. UNITED STATES.***

No. 9954.

Circuit Court of Appeals, Eighth Circuit.
Aug. 16, 1934.

Rehearing Denied Sept. 24, 1934.

*Writ of certiorari granted 55 S. Ct. 216, 79 L. Ed. ——.

Carlos W. Goltz, of Sioux City, Iowa (P. M. Young, of Mitchell, S. D., on the brief), for appellant.

Harry M. Reed, U. S. Atty., of Waterloo, Iowa, and D. C. Browning, Asst. U. S. Atty., of Sioux City, Iowa (John S. Pratt, Sp. Asst. to the Atty. Gen., and Glenn B. Beers, Asst. U. S. Atty., of Waterloo, Iowa, on the brief), for the United States.

Before GARDNER and SANBORN, Circuit Judges, and DEWEY, District Judge.

GARDNER, Circuit Judge.

Appellant, who will be referred to herein as defendant, was indicted for the violation of section 338, USCA, title 18, section 215 Criminal Code, in an indictment containing fifteen counts. During the trial, counts 8, 9, and 12 were dismissed by the government, and the defendant was found guilty on the remaining counts.

The scheme to defraud as charged in the indictment consisted in representing that defendant was about to recover from the British government from five to twenty-two billions of dollars in gold, jewels, and real estate; that this vast estate would be distrib-

uted to donors to a fund, to be used by defendant in recovering the estate, in proportion to contributions made by donors; that defendant had discovered the only living heir of Sir Francis Drake, the great navigator and buccaneer, who died about 1596; that this only surviving heir had assigned to defendant in 1922 or 1923 his interest in the Drake estate, and that the Lord Chancellor of England had looked over and passed upon the genealogy of this heir, and had agreed that defendant's assignor was the only living heir of Drake, and was directing the checking of the returns from Drake's property to make sure that defendant was paid, not only the value of the property, but all income and increase therefrom from the date of Drake's death to the date of payment.

During the time of the commission of the crime charged in the indictment in all its parts, defendant lived in London, England. He induced some twenty agents located in various parts of the United States to solicit funds for the avowed purpose of using them to get possession of the alleged Drake estate. It is charged that the representations about the Drake estate were false and that the scheme was a scheme to defraud.

While it is claimed on this appeal that the evidence is insufficient to sustain the verdict on the various counts, the substantial questions presented relate to alleged errors of law occurring at the trial, or preliminary thereto. Despite the palpable fraud in the representations made, and the incredible nature of the representations of defendant and his agents, they seem to have fired the imagination and dulled the sense of reason of many honest people who relied on them, and during some ten years of activity defendant received, through his various agents in the United States from $700,000 to $800,000 in cash.

■ Specifications of error urged by defendant occupy sixty pages of the printed brief. It will not be possible to consider in detail all of these alleged errors. The object of the rule requiring an assignment of errors is to enable the court and opposing counsel to determine on what points appellant's counsel intend to seek a reversal of the judgment, and to limit the discussion to such points; but, where there is an unlimited assignment, it amounts to a perversion of the rule, defeats its purpose, and bewilders both court and counsel. While we have laboriously gone through this entire record and considered each specification of error, we shall attempt, as far as possible, to group the questions

presented and limit our discussion to such points as impress us as being substantial.

I. Each count of the indictment sets forth in detail the representations alleged to have been made. Defendant interposed a motion for bill of particulars which was denied, and this action of the court is urged as error. It is contended by defendant that the indictment charges the falsity of these representations in general language. Summarizing these allegations of representations into as narrow a statement as possible, they charge: (1) That defendant had discovered the only living heir of Sir Francis Drake; (2) that the genealogy of such heir had been definitely established and approved by the high British authorities; (3) that defendant had secured an assignment to himself from such heir; (4) that the British government had recognized his right to the possession of the vast Drake estate; (5) that he was obliged to expend large sums of money for the fees of lawyers and experts, and other necessary expenses, in order to assure the delivery of the estate to him; (6) that the amount of the necessary expenditures was a weekly minimum of $2,500; (7) that the persons who contributed money to assist him in meeting the expenses would be repaid on the basis of at least $1,000 for every dollar contributed; (8) that he was a British subject, and would soon receive a title; (9) that Sir Francis Drake died, leaving a son, and at the death of Sir Francis Drake his estate was fraudulently administered by a brother of Sir Francis Drake; (10) that he (defendant) had discovered the rightful heir, but that the genealogy had to be passed upon "by the highest powers that be"; (11) that the genealogy of Drake was made final in August, 1923, by the Lords' and King's Commission; (12) that from the time the heir was established in 1923 until August, 1925, defendant had been engaged in checking up the property and its accumulations; (13) that since August, after the baronetcy was established, he was getting all details ready to take possession of everything that followed the title under the law of to-day; (14) that this law was passed thirty or forty years ago, and gave to the rightful heir his right to transfer all property and everything that followed the title; (15) that the contributors could see that everything which belonged to Sir Francis Drake at his death would have to be accounted for by the Crown and subsequently turned over to the defendant; (16) that the genealogy had been presented to the Crown Commission, which was the highest power in the British Empire, and

could not be attacked by the courts; (17) that since the death of Drake there had always been a dispute which accounted for the Crown's control and supervision of everything that belonged to the estate of Sir Francis Drake; (18) that the Crown confiscated the whole thing from the parties in possession and turned it over to the rightful heir in the baronetcy; (19) that it was said by people in high finance that the amount of the estate was considerably over the combined debt of Great Britain to the United States of America and all the other countries' indebtedness to Great Britain, and that it amounted to $22,500,000,000; (20) that the contributors could figure up all the land in the state of Iowa at an average price of $125 per acre and all the stock and bank deposits in Iowa, as well as the railroads and cities combined, and that defendant could buy the whole lot and put a fence around the whole state, and still have more money left than the contributors ever thought of; (21) that, if the contributors had all over and above $5,000,000,000, they could buy the whole city of Des Moines and build a fence around it; (22) that every tree, load of wood, and timber that had been cut off the lands since the death of Drake was accounted for, as well as the accumulation of moneys, and money from rock quarries, brickyards, pottery, clay, minerals, ores, fishing rights, income from railroad lands, and all rents from properties that had been accumulated; (23) that this money had been working for over three hundred years, both in the ecclesiastical and governmental departments; (24) that the nation of Great Britain was the one which owed this bill, and that nation was reliable, safe, and sound, and had verified defendant's claim; (25) that the original documents had been sealed and locked away in the archives, and that five copies were in the hands of the people who should have them; (26) that all moneys, properties, lands, title deeds, heirlooms, and personal effects of the late Sir Francis Drake and his heirs were to be handed over to defendant with the utmost possible speed; (27) that defendant had been recognized by King George, but that he had not gone through the formality of recognition; (28) that defendant was the only real Sir Francis Drake, and that everything belonged to him, and his claim had been O. K.'d by the Crown; (29) that, by reason of an error, certain papers and charts had to be made out afresh which meant an extra benefit to him of 250,000 pounds sterling; (30) that the expense that was attached to the balance sheet ran from $3,000 to $5,000 a week, and had so run since the middle of August; (31) that the day of the finish he would send a copy of the London Gazette, the only official government paper printed in London, which would tell the contributors of defendant's name being changed on deed poll to Francis Drake, and that thereafter he would be raised to the peerage, the crests for which had already been made.

■■ Defendant in his motion asked that the government be required to set out what was false about each of the claims just summarized above. In each instance defendant asked the government to set out what was false about his alleged representation. There are doubtless many instances under which, in order to comply with the constitutional requirement of certainty in the accusation, an indictment should not only allege the falsity of the misrepresentation, but allege affirmatively in what the falsehood consists. The indictment here, however, fairly apprised defendant of the charge against him. The charged misrepresentations were directly stated, and it is charged that these representations were false. There would seem to be no possibility that defendant might be taken by surprise at the trial, or that the government, under these allegations, might introduce proof not fairly within the plain terms of the allegation, and hence there was no function to be performed by a bill of particulars. Motion for a bill of particulars is generally addressed to the sound discretion of the trial court, and, unless it appears that this discretion has been abused, the ruling will not be reversed. Dunlop v. United States, 165 U. S. 486, 17 S. Ct. 375, 41 L. Ed. 799; Savage v. United States (C. C. A. 8) 270 F. 14; Hyney v. United States (C. C. A. 6) 44 F.(2d) 134. The representations were charged to be utterly false. A bill of particulars could not have added anything to the information conveyed by the indictment.

■ II. Defendant moved to strike from the indictment certain phrases used to describe the original Drake fortune. It would seem quite unnecessary to reproduce these various phrases attacked by this motion. The indictment alleges the scheme, the misrepresentations and falsity, and the use of the mails. There are many embellishing phrases embodied in this indictment that might more appropriately have been used in a newspaper article than in an indictment. Whoever prepared it possibly indulged in phrase-making to an unwarranted degree, and it is prolix and contains much redundant and immaterial

matter. These defects, however, do not vitiate the indictment, as the embellishing phrases may properly be disregarded as surplusage. Busch v. United States (C. C. A. 8) 52 F.(2d) 79; Goldstein v. United States (C. C. A.) 63 F.(2d) 609.

■■ III. The sufficiency of the indictment was challenged by demurrer and motion to quash. It is urged that defendant could not be tried in the District Court of the United States for the Northern District of Iowa because he at the time of the commission of the crime charged was in London, England. The gist of the offense described in the statute is not the devising of a scheme to defraud. That in itself is not a crime under the laws of the United States. Such an act becomes criminal under the statute only in the event the United States mails are used in carrying it into effect. Busch v. United States (C. C. A. 8) 52 F.(2d) 79; Cochran v. United States (C. C. A. 8) 41 F.(2d) 193. The indictment alleges that defendant caused to be delivered letters within the Northern District of Iowa. Under the statute, knowingly to cause a letter to be delivered by mail in accordance with the directions thereon for the purpose of executing a scheme to defraud is an offense separate from that of mailing the letter or causing it to be mailed for the same purpose, and, where the letter is so delivered as directed, the person who caused the mailing likewise causes the delivery at the place of delivery, and may be prosecuted in that district, although he was not present therein. Salinger v. Loisel, 265 U. S. 224, 44 S. Ct. 519, 68 L. Ed. 989; Hyde v. United States, 225 U. S. 347, 32 S. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614; Burton v. United States, 202 U. S. 344, 26 S. Ct. 688, 50 L. Ed. 1057, 6 Ann. Cas. 362; United States v. Steinberg (C. C. A. 2) 62 F.(2d) 77.

In United States v. Steinberg, supra, the Circuit Court of Appeals of the Second Circuit held that one who had mailed a letter in Canada, which was delivered in the United States, was subject to prosecution under section 338, title 18, USCA, in the United States. We have held that, where a scheme to defraud or to obtain money by false pretenses was charged, when such scheme is criminally participated in by more than one individual, it constitutes of itself a conspiracy, and all who engage therein are equally guilty. Cochran v. United States (C. C. A. 8) 41 F.(2d) 193; Busch v. United States (C. C. A. 8) 52 F.(2d) 79; Chambers v. United States (C. C. A. 8) 237 F. 513. If defendant's associates knowingly participated in this alleged scheme, then they were guilty of a conspiracy, and all those participating in the furtherance of the scheme, whether within the United States or without, would be equally guilty. Ford v. United States, 273 U. S. 593, 47 S. Ct. 531, 71 L. Ed. 793. But if, on the other hand, defendant's aides were innocent, then the defendant would still be guilty of the commission of a crime within the jurisdiction of the lower court if while remaining in London he procured the commission of a crime through these innocent agents. The acts constituting the gist of the offense took place within the jurisdiction of the lower court.

The demurrer and motion were properly overruled.

IV. Complaint is made of the court's rulings as to the qualification of jurors.

■ (1) Two jurors on their voir dire testified that they had made contributions to the Drake estate fund or the Hartzell fund, which had never been repaid. The government challenged these jurors for cause, and the court sustained the challenges. These jurors had an interest in the litigation, and hence were subject to challenge. Frank v. United States (C. C. A. 9) 59 F.(2d) 670. The findings of the trial judge on such an issue will not be set aside unless manifestly erroneous, and the qualifications of a juror to sit in a cause are to be determined by the trial court. Reynolds v. United States, 98 U. S. 145, 25 L. Ed. 244; Nations v. United States (C. C. A. 8) 52 F.(2d) 97; Union Electric Light & Power Co. v. Snyder Estate Co. (C. C. A. 8) 65 F.(2d) 297. Defendant had a right to have his cause tried by an impartial jury, but he had no right to have any particular member of the panel sit upon the trial unless such member had been accepted and sworn as a juror. Marande v. Texas & P. Ry. Co. (C. C. A. 2) 124 F. 42; Northern Pac. R. Co. v. Herbert, 116 U. S. 642, 6 S. Ct. 590, 29 L. Ed. 755; Hayes v. Missouri, 120 U. S. 68, 7 S. Ct. 350, 30 L. Ed. 578; Howard v. Kentucky, 200 U. S. 164, 26 S. Ct. 189, 50 L. Ed. 421.

■ (2) In examining a prospective juror named Sitzman on his voir dire, the court asked him if his mind were open and unbiased, and if he would make a good, fair juror without any interest or knowledge one way or the other. The juror answered, "Well, I feel as though it is nothing but a—." Before the juror finished his remark, the court interrupted, saying: "You need not tell— the question is whether you can try this case

as an unbiased juror on the evidence." Defendant's attorney then examined the juror as follows: "You started to say, Mr. Sitzman, 'I feel as though it is nothing but a—,' what was the rest you were going to say? The juror answered, 'Damned scheme.'" Counsel for defendant challenged the juror, and the challenge was sustained. Thereupon counsel for defendant said, "And we likewise ask that the Court admonish the jury panel." The court replied that there was no jury yet to be admonished, to which counsel responded, "I mean those jurors, prospective jurors, talesmen that are present and have heard this juror's statement, that they should be admonished not to consider it." The trial judge responded, "The court will admonish the jury when the jury is impaneled." No further action was taken by the court or the defendant. It is urged that it was prejudicial to allow this remark to stand without admonition. It may be observed that counsel for defendant is responsible for the remark. It was brought out presumably for the purpose of showing that the juror was biased and it was proper for that purpose, and the court properly sustained the challenge. The matter was not again brought to the court's attention, and the incident is too trivial to warrant serious consideration. It is not conceivable that the incident could have prejudiced the defendant, but, if it was considered serious, then counsel should subsequently have obtained a direct ruling in order to preserve the objection. There is no exception to the ruling of the court, and the ruling was not final.

(3) Defendant also complains of the action of the court in overruling his challenge for cause to the juror Wierda. Defendant exercised a peremptory challenge on this juror, but he contends that he was compelled so to do when the juror should have been excused on his challenge for cause. Defendant did not exercise all his peremptory challenges before the trial jury was impaneled and sworn. The juror having been peremptorily challenged by defendant, and an impartial and competent juror obtained in his place, no prejudice was done the defendant because defendant still had an unexercised peremptory challenge. Spies v. Illinois (Ex Parte Spies), 123 U. S. 131, 8 S. Ct. 21, 22, 31 L. Ed. 80; Hopt v. Utah, 120 U. S. 430, 7 S. Ct. 614, 30 L. Ed. 708; Krause v. United States (C. C. A. 8) 147 F. 442; Holt v. United States, 218 U. S. 245, 31 S. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138; Stroud v. United States, 251 U. S. 15, 40 S. Ct. 50, 64 L. Ed. 103.

V. Great stress is placed upon certain rulings of the court on the admissibility of evidence.

(1) Over objection of counsel for defendant, testimony was given by officers as to the conversations had with the defendant after his arrest. The statements were not confessions, but at most admissions against interest. In the federal courts there is no presumption against the voluntary character of a confession, and the burden is not on the government in the first instance to show its voluntary character. Gray v. United States (C. C. A. 9) 9 F.(2d) 337; Wigmore on Evidence (2d Ed.) § 860. The mere fact that defendant was under arrest did not render inadmissible the statements which he made. Ziang Sung Wan v. United States, 266 U. S. 1, 45 S. Ct. 1, 69 L. Ed. 131; Pierce v. United States, 160 U. S. 355, 16 S. Ct. 321, 40 L. Ed. 454. The admissibility of such evidence depends largely upon the circumstances connected with the statements, and the matter is largely to be determined by the trial court. There is nothing in the evidence indicating that the statements were not voluntary, and hence they were admissible.

(2) Defendant objected to the introduction of certain cablegrams or secondary evidence of their contents. These cablegrams appeared on their face to come from London, England, and at the end or bottom of them appeared the name "Hartzell." They all bore extrinsic evidence of relating to the business which defendant was carrying on in this country, and they were delivered to the persons with whom defendant was shown to be corresponding, or through whom he was carrying on his business in America. It is urged that there was not a sufficient foundation laid for the introduction of secondary evidence as to the contents of the cablegrams. The persons to whom the cablegrams were addressed testified that they had destroyed the copy of the cablegram received, or had made diligent search and had been unable to find them. Proper foundation was therefore laid for secondary testimony of the contents of the lost or mislaid cablegrams. Purington Paving Brick Co. v. Metropolitan Pav. Co. (C. C. A. 8) 4 F.(2d) 676; McGowan v. Armour (C. C. A. 8) 248 F. 676; Missouri Dist. Telegraph Co. v. Morris & Co. (C. C. A. 8) 243 F. 481; Stockyards Loan Co. v. Miller (C. C. A. 8) 288 F. 176; General Motors Acceptance Corp. v. American Ins. Co. (C. C. A. 5) 50 F.(2d) 803; Wharton's Criminal Evidence (10th Ed.) §§ 198

and 199; Zoline's Federal Criminal Law and Procedure, § 412.

 If the copies of the cablegrams as received were admissible in evidence, then the oral testimony was admissible. It remains to consider, however, whether the copies of the cablegrams delivered were admissible. The original cablegrams were, of course, delivered to the sending office, and these instruments were not offered in evidence. Contents of telegrams may be proven either by primary or secondary evidence. Primary evidence is, of course, the original telegram itself. Secondary evidence of a telegram may consist of a copy proved to be correct, or oral evidence of the contents by one who has seen it and knows its contents. But, before secondary evidence may be received, the absence of primary evidence must be satisfactorily accounted for. In a criminal case in which it is claimed that the defendant is the sender of the telegram, the original telegram is the one filed in the sending office. Montgomery v. United States (C. C. A. 8) 219 F. 162. The rule might be otherwise if the defendant were the recipient of the telegram, but that is not here material. Secondary evidence of the contents can only be admitted when proper foundation has been laid by proof of loss, destruction, or other facts sufficient to permit the admission of secondary evidence. Here it appears that the cablegrams were sent from London, England, and therefore the original was out of the jurisdiction of the court. Under such circumstances, secondary evidence became admissible. Burton v. Driggs, 20 Wall. 125, 22 L. Ed. 299; Galbreath v. United States (C. C. A. 6) 257 F. 648; Ritter v. State, 70 Ark. 472, 69 S. W. 262. But it is still necessary to consider whether the cablegrams were sufficiently identified as coming from the defendant.

 Ordinarily, where a writing is not shown to have been executed by the defendant, it cannot be offered in evidence against him. To be admissible in a criminal case, either to connect the defendant with the commission of the crime, or to procure a verdict against him, a writing must be established with that degree of certainty recognized as necessary to a conviction. Sprinkle v. United States (C. C. A. 4) 150 F. 56. A writing, of course, does not prove itself, and there is no presumption that a telegram is sent by the party who purports to send it. McGowan v. Armour (C. C. A. 8) 248 F. 676; Drexel v. True (C. C. A. 8) 74 F. 12; Ford v. United States (C. C. A. 9) 10 F.(2d) 339. The government was therefore bound

under the established rules of evidence to prove that Hartzell was the person who sent these messages. Some of them, relating to the granting of a power of attorney to certain persons by Hartzell to represent him, might be put aside because Hartzell, by the admissions above held to be competent, admitted that these same persons held his power of attorney. This fact was clearly established by other evidence, so there could have been no prejudice to defendant in so far as such cablegrams are concerned. Holt v. United States, 218 U. S. 245, 31 S. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138; Beach v. United States (C. C. A. 8) 19 F.(2d) 739; Cooper v. United States (C. C. A. 8) 9 F.(2d) 216; Bergera v. United States (C. C. A. 8) 297 F. 102; Kreuzer v. United States (C. C. A. 8) 254 F. 34; De Moss v. United States (C. C. A. 8) 250 F. 87.

 But as to these and the other cablegrams there is undisputed evidence in the record sufficient to establish their authenticity and defendant's connection therewith. (a) Large sums of money were forwarded to defendant in London by the agents whom he selected to carry on his work in this country. The cablegrams fit into as related parts of a whole scheme with other circumstantial evidence, the competency of which is not challenged, establishing the connection between defendant and these parties to whom the cablegrams were sent. (b) Their subject-matter, considered with this other evidence, competent and undisputed, unquestionably proves plaintiff to be their author. The connection of a defendant in a criminal case with the writing or mailing of a writing may be established by circumstantial as well as direct evidence. Cochran v. United States (C. C. A. 8) 41 F.(2d) 193; Montgomery v. United States (C. C. A. 8) 219 F. 162; Watlington v. United States (C. C. A. 8) 233 F. 247; Rice v. United States (C. C. A. 1) 251 F. 778; Ford v. United States (C. C. A. 9) 10 F.(2d) 339; Schwartz v. United States, 56 App. D. C. 105, 10 F.(2d) 900; Gridley v. United States (C. C. A. 6) 44 F.(2d) 716; Van Riper v. United States (C. C. A. 2) 13 F.(2d) 961; Lewis v. United States (C. C. A. 1) 295 F. 441, 443.

In the last-cited case, the identification of a telephone call was held sufficient, although the customer victims of the defendants in that case, which was a prosecution for violation of section 215 of the Criminal Code (18 USCA § 338), had never known defendants personally nor seen them, and, of course, could not recognize their voices. The court said: "The undisputed testimony

showed that the defendants were carrying on a wholesale business of this sort by telephone. * * * The gist of the problem is whether there was sufficient identification of the persons in the Boston office calling the witnesses, or later responding to the calls of the witnesses, so as to justify the court in admitting the evidence. Plainly, recognition of the voice is not the only means of identification. Circumstantial evidence may be as persuasive as testimony that the voice is recognized."

Defendant's contention that there was not sufficient foundation in the evidence for the receipt of these cablegrams is without merit.

(3) I. T. Jones, an attorney at law, called on behalf of the government, testified to the receipt from the defendant of certain letters which he identified. His testimony was objected to as being privileged because the letters constituted confidential communications between attorney and client. It is sufficient to say that the evidence does not show that this witness was retained by the defendant in the matters concerning which he was interrogated. The communications, in other words, were not confidential communications between attorney and client. It also appears without dispute that substantially the same communications were sent to others who were not attorneys, and one of these witnesses testified to that effect. The defendant, in one of the communications at least, advised the witness to read the letter "to parties you know you can trust." The privilege does not extend to the protection of matters not in their nature private or which cannot be properly termed the subject of a confidential disclosure.

Similar objections were made to certain cablegrams passing between defendant and P. M. Young, an attorney at Mitchell, S. D., at which time the relationship of attorney and client may be assumed to have existed; but copies of all these cablegrams were elsewhere admitted in evidence, so that, if error occurred, it could not have been prejudicial.

(4) Objection was made to the introduction in evidence of the will and codicil of Sir Francis Drake, and the definitive sentence or probate thereof. These were photostatic copies certified by C. Wilkinson, the assistant registrar at Sommerset House, London, England, to be true copies of the "original will and the codicil record in this Registry." Each of these exhibits has attached thereto the certificate of the American consul to Great Britain, under his consular seal, to the effect that C. Wilkinson "was at the time of signing the said certificate Assistant Registrar of the Probate Division of the High Court of Justice of England, duly commissioned and qualified, that said C. Wilkinson is the officer of said court authorized to sign and seal official copies of such documents and that the seal affixed to the said certificate is the seal of said Probate Division of the High Court of Justice." These copies were procured at Sommerset House, London, England, that being the registry of the Probate, Divorce and Admiralty Division of the High Court of Justice, and the regular depository of such documents.

We think it clear that, under the rule prevailing in the federal courts, there was not sufficient foundation for the introduction of these exhibits. Church v. Hubbart, 2 Cranch, 187, 2 L. Ed. 249; The Alice (D. C.) 12 F. 923; American Surety Co. v. Sandberg (D. C.) 225 F. 150, affirmed (C. C. A. 9) 244 F. 701; Stein v. Bowman, 13 Pet. 209, 10 L. Ed. 129; United States v. Lew Poy Dew (D. C.) 119 F. 786; Edison Electric Light Co. v. Elec. Engineering & Supply Co. (C. C.) 60 F. 401.

The rule announced in Church v. Hubbart, supra, is that a foreign judgment may be authenticated (1) by an exemplification under the great seal; (2) by a copy proved to be a true copy; (3) by the certificate of an officer authorized by law, which certificate must itself be properly authenticated. See, also, Stein v. Bowman, supra.

There is no proof in the record of the authority of C. Wilkinson to make the certificates. The certificate under seal of the consul does not meet the requirements, as there is no authority in the consul to so certify. The rule of Church v. Hubbart, supra, is the common-law rule in America. Wigmore on Evidence, § 1681.

If the Iowa statute may be invoked, and we refrain from expressing any opinion on that question, copies of records and proceedings in courts of a foreign country may be authenticated as follows: (1) By the official attestation of the clerk or officer in whose custody such records are usually kept; (2) by the certificate of one of the judges or magistrates of such court that the person so attesting is the clerk or officer legally intrusted with the custody of such records, and that the signature to his attestation is genuine; (3) by the official certificate of the officer who has the custody of the principal seal of the government under whose authority the court

is held, attested by said seal, stating that such court is duly constituted, specifying the general nature of its jurisdiction, and verifying the seal of the court. Iowa Code 1924, § 11308. But the government neither complied with the requirements of the common-law rule of Church v. Hubbart, supra, nor the Iowa Code. Neither can the admission of these documents be sustained under the ancient document rule. Documents coming from official custody and bearing on their face every evidence of age and authenticity, and which present an honest as well as ancient appearance, are admissible in evidence as ancient documents. With reference to such documents, it is only necessary to show that they are of the age of thirty years, and come from a natural and reasonable custody. McGuire v. Blount, 199 U. S. 142, 26 S. Ct. 1, 50 L. Ed. 125. But neither the certificates nor the photograph here offered are ancient, and there is no satisfactory proof that the will or the definitive judgment are correctly reproduced in the photostatic copy. In United States v. Ortiz, 176 U. S. 422, 20 S. Ct. 466, 44 L. Ed. 529, photographs of documents were held to have been properly admitted in evidence where the photographer by whom the photographs were made testified as to the accuracy of the methods pursued and the results obtained by him. Certainly the photograph must be verified by some one. Wigmore on Evidence, §§ 790, 793; Stone v. Chicago, M. St. P. & P. Ry. Co. (C. C. A. 8) 53 F.(2d) 813; Northern Pac. Ry. Co. v. Alderson (C. C. A. 9) 199 F. 735; Nebraska State Bank v. Walker, 111 Neb. 203, 196 N. W. 128. There is nothing in this record to authenticate the photograph of these documents, except the certificates above described, which are, for reasons stated, wholly inadequate.

■ While the exhibits were improperly admitted in evidence, it does not necessarily follow that the error was prejudicial, and defendant is not entitled to a reversal of the judgment unless it appears that he has been denied some substantial right amounting to the denial of a fair trial. Judicial Code, § 269, title 28 USCA § 391; Beck v. United States, 62 App. D. C. 223, 66 F.(2d) 203; Goldstein v. United States (C. C. A. 8) 63 F.(2d) 609; Salerno v. United States (C. C. A. 8) 61 F.(2d) 419; Feigenbutz v. United States (C. C. A. 8) 65 F.(2d) 122; Goode v. United States (C. C. A. 8) 58 F.(2d) 105; Kubik v. United States (C. C. A. 8) 53 F.(2d) 763; Sloan v. United States (C. C. A. 8) 31 F.(2d) 902; Segurola v. United States, 275 U. S. 106, 48 S. Ct. 77, 72 L. Ed. 186; Holsman v. United States (C. C. A. 9) 248 F. 193.

■ The purpose of the evidence was to show the falsehood of defendant's representations to the effect that he had a claim based upon the Francis Drake estate, or properly growing out of the provisions of his will. We know as a matter of history that Sir Francis Drake died in 1596, more than three centuries ago. It appears from competent evidence that there was no unsettled or unappropriated estate in existence which had formerly belonged to Sir Francis Drake, or any member of his family. Admissions made by the defendant were proved which established beyond all peradventure of doubt that the claim he was making was to his knowledge spurious, fictitious, and without foundation. Expert testimony showed that any claim to the personal or real property of the estate would long since have been barred by the statute of limitations and laches, and without any such proof we should know judicially that, based upon the common law of England as it existed at the time of the adoption of the first judiciary act, no such claim could now be successfully maintained. It appears in some parts of the record that defendant claims the right to recover vast sums from the British government through Sir Francis Drake, and expert evidence shows that such a claim could have no existence. The claim made by defendant that he had obtained from some one a claim against the Drake estate, or the right to recover it, was shown to be without foundation, because such a claim was not assignable. Defendant represented that his claim had been passed on by the ecclesiastical courts, but the evidence shows that such courts have had no jurisdiction of such a matter since 1857. Defendant claimed in his representations that he had secured certain rights in secret proceedings, while the evidence shows, and we know as a matter of history, that all courts and court proceedings in England are public. There was evidence that the defendant represented that the genealogy of Sir Francis Drake was made final in 1923 by the "Lords' and King's Commission," but the evidence shows that there never has been such a commission in England. Defendant represented that the Lord Chancellor had charge of the estate; that the archbishops and bishops desired further extension in the matter, but it was shown that under the laws of England none of these officials could have had anything to do with such a matter. Defendant claimed that his name was about to be changed to Sir Francis Drake, and he would be raised to the

peerage, both of which are shown to be impossible. In this state of the evidence, the admission of the copy of the will and definitive sentence could not possibly have prejudiced defendant. His claim that he was either to have had a claim against or through the Sir Francis Drake estate was conclusively shown to have been false without any reference to the will or definitive sentence.

Post Office Inspector Williamson, in an interview with defendant, asked him where the Drake estate was. To this inquiry defendant waved his hands and said it was all over. In another interview he was asked where the Drake estate was, and said, "I cannot tell you that offhand, it is all over the place." This was in December, 1932, and he had been operating since 1922. He was asked if three years before he had not been requested to go to Scotland Yard in London, so that he could give information concerning the Drake estate. He answered, "Yes, which I could not do." He was asked, "After all this time you ought to be in a position to do so now." He said, "I wish I was. I wish I was in a position to tell you everything. I would give you $5,000.00 to be in that position." He was also asked, "It amounts to this, Mr. Hartzell, you cannot give us any information concerning the estate of Sir Francis Drake, or any of the supposed heir?" He answered, "No, I cannot myself personally; the estate is all over the place. That is my understanding."

Defendant was interviewed in New York City by an Assistant United States District Attorney, who testified in the case. Defendant was asked, "How is the unclaimed Drake estate coming along?" Defendant answered, "There is no such thing as an unclaimed Drake estate." This witness further testified as to what defendant said: "Sir Francis Drake had a wife and child who were not known and that his claim came through them. I asked the name of his wife and child and he said, 'I cannot tell you.' I asked what the name of the child was through whom his claim arose. He said, 'I cannot tell you that.' I asked if he had the assignment with him. He said he would not and could not tell me."

O. B. Williamson, a post office inspector, had an interview with defendant in which, he testified, defendant said, "There was no unclaimed estate anywhere, the estate was all over." Another witness testified that defendant told him in June, 1933, that he was not claiming the Sir Francis Drake estate, but it was the property that should have gone to an infant son who was defrauded out of his property.

Thomas W. Barnard, testifying to a conversation with the defendant in London, in June, 1930, testified as follows: "He said he first came to England during the war with a bunch of crooks, the principal among whom was a woman or person named Whitaker; that he had carried on with them for some time but had dropped them as he was scared of the game and since 1921 had carried on a scheme in connection with a claim of the Sir Francis Drake estate. He said that this estate consisted of many millions of pounds and that there were 1,100 acres right in the center of London which proved very attractive to his supporters. I asked him if he was making any money out of it and he said he was making plenty. He said that since 1921 the only business he had done was in connection with this claim to the Sir Francis Drake estate. I said, knowing something of these estates that had been promoted before, that it was a wonder the authorities didn't get after him. He said, 'They did take an indictment against me in the United States at one time, but I got away with it.' He then said, 'This is a racket based on an old legend.' I asked him what the supporters or contributors would get out of this matter. He said he couldn't say."

There is nothing in the record to uphold or even give color to defendant's representations. For the most part they are not only false, but fantastic and absurd, many of them false as a matter of history, and many of them conclusively shown to be false as a matter of law. It appears that there is no semblance of fact upon which these representations are based, but they are figments of falsehood, and the admission in evidence of the purported copy of the will and definitive sentence added nothing in support of the government's case, and resulted in no possible prejudice to the defendant.

█ (5) Copies of certain statutes of England were identified by one Charles Challen, of the London, England, bar, and admitted in evidence. They were identified by this witness as being accepted as statute laws of England, and, while we do not think they had any particular bearing on the case, we think the statutes were sufficiently authenticated. Wigmore on Evidence, § 1684; Nashua Savings Bank v. Anglo-American Mtg., etc., Co., 189 U. S. 221, 23 S. Ct. 517, 47 L. Ed. 782. Certainly, their admission in evidence could not have been prejudicial to the defendant.

(6) It is urged that certain of the indictment letters were not sufficiently identified, and that hence the court erred in admitting them in evidence. Otto G. Yant testified that he lived at Mallard, Iowa, in 1931, and that Exhibit 10–B was a substantial copy of a letter which he received. Many letters and cablegrams from defendant were put in evidence, and this letter bears at least the indication of defendant's style of expression and trend of thought. At the time this exhibit was written, August 21, 1931, a fraud hearing had been held in Washington, D. C., and Yant, who had successfully solicited funds for defendant's enterprise, with others, had signed an affidavit in which they agreed to cease soliciting. Some considerable correspondence passed between defendant and Yant relative to these proceedings at Washington. Correspondence between defendant, his sister, Pearl Palmer, and Yant and others concerning this fraud order continued until Exhibit 10–B was written. This exhibit fits into all this correspondence. It goes back to the hearing before the postal department, and censures Yant and others for submitting to the "embargo." In this exhibit defendant said, "You have not got the nerve to defy the officials and tell them to do their worst. * * *" It closes with, "I am sending a copy of this letter to Dr. Cochran, Biddle Stela, Osborne, Hinz, Carlson, Hartsock, Landes and Brother and Sister Pearl and Ray." Pearl Palmer's husband's Christian name was Ray. The other persons were all agents of defendant. Landes testified that he received a copy of this letter from London, and so did Osborne. As further identifying this letter in which defendant censures Yant, on July 31, 1931, Yant wrote to Hartzell referring again to the fraud hearing and the fact that Yant had agreed not to solicit for defendant. He added a postscript as follows: "If I have to be your official goat over here just whisper in my ear, please." Defendant sent a long cablegram to Yant on August 17, 1931, the last three lines of which are as follows: "Answer to your postscript phrase. I don't need any official or any kind of goat. If I had I would have told you so." On August 18, 1931, Yant cabled defendant, saying, "Can vindicate myself. You cannot prove your statements." On August 19, 1931, defendant cabled Yant as follows: "Cable received. I will prove all my statements when the time is right but not by cable. * * * I notice your cable was inspired by McCarty. He will also have to protect his sheepskin." On August 19, 1931, Yant cabled defendant, "Cable was not inspired by McCarty."

The letter, Exhibit 10–B, contains many references to McCarty, an attorney who apparently appeared on behalf of Yant and others at the fraud hearing in Washington. The proof showed that the typewriting on this exhibit was the same as on other exhibits which defendant was shown to have admitted that he sent. Yant testified that, when he received the letter of which Exhibit 10–B was a copy, it made him very angry and he destroyed it. The exhibit in evidence was shown to have been received by Hartsock through the mail. Where the contents of a letter reveal a knowledge or other trait peculiarly referable to a single person, a sufficient foundation is laid for its receipt in evidence. Wigmore on Evidence, § 2148; People v. Dunbar Contracting Co., 215 N. Y. 416, 109 N. E. 554; State v. Freshwater, 30 Utah, 442, 85 P. 447, 116 Am. St. Rep. 853.

What has been said with reference to Exhibit 10–B is equally true of Exhibits 9–B, 11–B, 12–C, 13–B, 14A–D, 15–B, and 15–C. In addition, these last-named exhibits were identified as coming from defendant, and Exhibits 9–B, 11–B, and 12–C were further identified by expert testimony as being in the handwriting of defendant. All of these exhibits, including Exhibit 10–B, were delivered through the United States mail in the Northern District of Iowa. Exhibits 14A–D, 15–B, and 15–C are copies of cablegrams sent through the mail by defendant to Hartsock. Kramer, who possessed a power of attorney from Hartzell, on September 12, 1932, cabled defendant in London that he was working but donations were falling off, and requested news, saying, "Answer me to Willowlake, South Dakota until Wednesday." On September 14, 1932, defendant wired Kramer a cable in reply, which is prefaced with, "Cable received." On September 17, 1932, Kramer cabled a reply, and on September 18, 1932, received a cablegram from defendant addressed to him at Adrian, Minn. The originals were destroyed. These copies, Exhibits 14A–D, were mailed from London. The principle above referred to is equally applicable to these exhibits. There is overwhelming circumstantial evidence that they were mailed by defendant. Cochran v. United States (C. C. A. 8) 41 F.(2d) 193.

Exhibits 15–B and 15–C are also copies of cablegrams sent from London to Hartsock at Laurens, Iowa. Landes, another agent of defendant, testified that he received the orig-

inal cablegrams and destroyed them. Dr. Nitzke testified that he received similar copies through the United States mail at Storm Lake, Iowa, sent from London.

Exhibits 78–A, 79–A, and 80–A were written by contributors to the fund and mailed, Exhibit 78–A being mailed to Senator Smith W. Brookhart and 79–A and 80–A being mailed to the Postmaster General and the Attorney General. They were all requests to do nothing to hinder defendant in his work, and were written at Hartzell's suggestion and request.

Exhibit 32–A is a letter purporting to be from Amos Hartsock to W. L. Mauney at Rochester, Minn., where Mauney received it through the United States mail May 25, 1932. Inclosed with this letter were two bulletins relating to operations. The matter was mailed at Laurens, Iowa. Hartsock testified that he was mailing out bulletins similar to Exhibits 32–B and 32–C, inclosed with 32–A. We think sufficient foundation was laid for the admission of all these exhibits in evidence.

Hartsock admitted writing the Exhibit 77–A, addressed to Ray Fear, Bronson, Iowa, stamping it and putting it in the United States mail, at Laurens, Iowa.

[■] The above are all the so-called indictment letters. Not only was proper foundation for their admission established, but the use of the mails within the Northern District of Iowa was thereby clearly shown. There were other attending circumstances to show mailing by defendant.

(7) Exhibit 48 was a photostat of several pages of handwriting, dated February 9, 1925, addressed to W. E. Owen, Des Moines, Iowa, signed O. M. Hartzell, together with the photostat of an envelope attached thereto. A handwriting expert testified that, comparing the writing in this exhibit with proved handwriting of defendant, he was of the opinion that the exhibit and the standards were written by the same person. The same record was made as to Exhibits 40, 44, 45, 46, and 47, and these photostatic copies of letters were admitted in evidence upon testimony from the expert that they were written by the same person who wrote the standards.

■ It is the contention of defendant that the court erred in admitting these letters in evidence, and that photographs were not a proper basis for purposes of comparison. There is no doubt but that formerly courts held that comparing photographic copies of handwriting with original specimens was not to be permitted, as it was feared that certainty could not be assured because there was the hazard that there might be errors or differences in copying. As pointed out by Professor Wigmore, whether because of a development in the art, or a change in judicial approach to the question, or both, this is not now the law. He says: "A photographic copy of handwriting may be used instead of the original so far as the accuracy of the medium is concerned." Wigmore, § 797.

■ Other questions are involved as to these exhibits; the first being the failure to produce the originals. The destruction of Exhibits 40, 44, to 48, inclusive, by Owen, who received them, was shown. The other three letters were shown to have been given by Owen to a post office inspector who lived in Des Moines. If the case turned on the propriety of using this secondary evidence as to these three letters, it would seem that defendant's objection to the use of secondary evidence should be sustained. However, in this particular case, these three letters are similar in import and substance to the other five, and hence no prejudice could result. Mr. Owen testified that he was reasonably sure that these were copies of letters he received. The court committed no prejudicial error in the challenged ruling.

■ (8) The defendant objected to the introduction in evidence of Exhibits 10–B, 11–B, 12–C, 13–B, 14, and 15. These are the so-called indictment letters. The basis of the objection is that W. C. Henning, qualified as an expert in handwriting, was permitted to identify these exhibits which were typewritten, using other typewriter standards. The signature on these exhibits was typewritten as well as the body. The objection interposed was that it was "incompetent, irrelevant, and immaterial, no proper foundation has been laid, and calling for speculation and surmise," and also "an attempt to usurp the function of the jury on a matter on which expert testimony is not proper." The question of the identity or similarity of two or more pieces of typewriting may be the subject of expert testimony. Bartholomew v. Walsh, 191 Mich. 252, 157 N. W. 575.

■ It is noted that the objection did not sharply call the attention of the court to the precise question now urged, and it is too general to present it for review. Missouri Pac. Ry. Co. v. Hall (C. C. A. 8) 66 F. 868; Wabash R. Co. v. Lewis (C. C. A. 8) 48 F.(2d) 519. The objection that expert testimony was not proper seems to indicate that defendant's counsel considered the qualifica-

584

tions either as proved or unimportant. He should not now be permitted to shift his grounds in this court. If the matter now urged had been called to the attention of the trial court and to opposing counsel, it might readily have been cured. The objection that "no foundation was laid" is too vague to call this point to the court's attention. Karlen v. Trebble, 45 S. D. 570, 189 N. W. 519.

 (9) Defendant objected to the introduction in evidence of Exhibits 83–A to C, inclusive. These are copies of letters and a cable from defendant to Dr. Cochran, which the witness Kuhnes received from E. W. Clark. Clark obtained $205 from Kuhnes as a contribution to the fund. Exhibit 83–B is the same as another exhibit, Exhibit 4, which was received in evidence, and Exhibit 83–A is very similar to Exhibit 3, which was received in evidence. Here again the subject-matter and style of these three exhibits furnish additional evidence of their being used as a means of furthering defendant's scheme, and of authenticity. Again, no possible prejudice could have resulted because of their similarity, actual or substantial, to other exhibits received in evidence, either without objection or upon uncontroverted foundation.

 Another exhibit, No. 88, was objected to. This is the affidavit in which the witness Yant and others agreed to cease having any connection with the defendant's enterprise and to refuse any remittances of money in connection therewith. This affidavit was admitted on one ground, and that was that defendant, in writing to Yant, referred to it. The government was seeking to establish the authenticity of this letter Exhibit 10–B, and, like any other fact that was referred to in it (e. g., persons, events, etc.), could be put in evidence to aid in the identification of the exhibit, to show what was referred to. If admissible for that purpose, it was properly in evidence, and, if defendant desired that its effect should be limited to that purpose, he should have asked a ruling to the effect, or requested an instruction.

 (10) Defendant complains that the court erred in sustaining objections interposed to certain abstract questions propounded to an expert on English law. This examination covered a wide field of abstract questions. Their materiality was not made to appear, but the short answer to the argument here is that there was no proffer of proof, and neither the lower court nor this

court was advised as to what it was claimed the witness, if permitted, would testify. Clauson v. United States (C. C. A. 8) 60 F.(2d) 694; Hatch v. United States (C. C. A. 8) 34 F.(2d) 436; Federal Surety Co. v. Standard Oil Co. (C. C. A. 8) 32 F.(2d) 119.

(11) The government was permitted to show that, after defendant was released on bail in this case, and prior to indictment, he attended a meeting at Sioux City, Iowa, on February 24, 1933, at which he said the Drake estate would be closed by June 1st; that he would need $2,000 a week until that time to close the estate; and that his present deficit was $15,000. It seems those present concluded that the best defense for the defendant would be the closing of the Drake estate, and to this end they appointed a receiver of a defense fund and raised $68,000 between February 24, 1933, and May 1, 1933. Other similar statements were made by the defendant. On November 9, 1926, he wrote, "The time is getting short and nearer every day." On March 29, 1928, he wrote, "They agreed to settle and turn over possession immediately after Easter vacation, 1928." On August 2, 1929, he wrote, "Delivery and complete settlement will be made before the end of August, 1929." On November 16, 1931, he wrote, "Nobody knows a week ahead about the finish."

 In prosecutions of this character, great latitude is allowed in the introduction in evidence of attending circumstances. Smith v. United States (C. C. A. 8) 267 F. 665. "The competency of a collateral fact to be used as the basis of legitimate argument is not to be determined by the conclusiveness of the inferences it may afford in reference to the litigated fact. It is enough if these may tend, even in a slight degree, to elucidate the inquiry, or to assist, though remotely, to a determination probably founded in truth." Williamson v. United States, 207 U. S. 425, 28 S. Ct. 163, 172, 52 L. Ed. 278. False statements outside the scheme charged are competent to show the defendant's fraudulent intent. Busch v. United States (C. C. A. 8) 52 F.(2d) 79; United States v. Sprinkle (C. C. A. 2) 57 F.(2d) 968; Vause v. United States (C. C. A. 2) 53 F.(2d) 346. The evidence admissible to establish the scheme and the intent may be extensive in scope and rests largely within the discretion of the trial judge. These admissions tended to show the nature of the scheme, the falsity of the representations, and the knowledge and intent of the defendant.

VI. Complaint is made that the court unduly limited defendant's counsel in his cross-examination of the witness Amos Hartsock. A defendant is entitled as a matter of right to have an opportunity of fairly and fully cross-examining the witnesses appearing against him. A denial of this right is usually prejudicial error. It is only after the right of cross-examination has been substantially and thoroughly exercised that the allowance of further cross-examination becomes discretionary with the trial court. Heard v. United States (C. C. A. 8) 255 F. 829; Cossack v. United States (C. C. A. 9) 63 F.(2d) 511; Minner v. United States (C. C. A. 10) 57 F.(2d) 506; Galindez v. United States (C. C. A. 1) 19 F.(2d) 352.

The witness Hartsock was one of defendant's agents in this country, who sent out some bulletins and circulars and made speeches as to the source of his information. It was shown that defendant had approved the whole of these bulletins and circulars. Further cross-examination as to reference in his speeches to a Miss Dietrich, a school teacher who had gone to England to investigate the matter, and to the witnesses talking to a Rev. Nestander about investigations he had made, were, we think, properly refused. The witness was asked if certain exhibits that had been taken from him by the sheriff of Pocahontas county, Iowa, had been taken near the town of Laurens, Iowa, and the letters taken from their envelopes and containers and shown promiscuously to the people after they had been seized. No error was committed in sustaining objections to such questions.

A witness, Mr. Yout, identified a letter addressed to him from defendant, which contained a reference to an "original Scotland Yard letter." Defendant's counsel was not permitted to cross-examine the witness as to the Scotland Yard letter.

Counsel also complains because a question asked on extended cross-examination of the witness Charles Challen as to the Judicature Act of 1833 was not answered because an objection was sustained, but counsel fails to show how in any way this act had any possible bearing on the case or how cross-examination of this witness would have been material. Bonner v. United States (C. C. A. 8) 46 F.(2d) 619.

VII. It is also contended by defendant that the use of his signature on a bail bond as a standard for comparison and proof of his handwriting on other exhibits was violative of the Fifth Amendment to the Constitution, because he was thereby made a witness against himself. But there was nothing in the nature of defendant's signature which was attached to the bond which tended to incriminate him. It was certainly not "tantamount to a written confession of guilt" as was the use of affidavits referred to in Safarik v. United States (C. C. A. 8) 62 F.(2d) 892, 897. The bond was a public document, open to any one who might desire to peruse it, and it contained nothing of an incriminating nature, and did not tend to prove the charge against defendant. The accused in a criminal trial for felony at least is compelled to be present in court. We think it could not be contended that, if a witness pointed to the accused as being the person whom he saw commit the crime charged, the defendant would thereby be compelled to furnish evidence against himself. Holt v. United States, 218 U. S. 245, 31 S. Ct. 2, 6, 54 L. Ed. 1021, 20 Ann. Cas. 1138; State v. Johnson, 67 N. C. 55; State v. Graham, 74 N. C. 649, 21 Am. Rep. 493. In the last-cited case the court said: "Suppose it be a question as to the identity of the prisoner, whether a person whom a witness says he saw commit a murder, and the prisoner appears in court with a veil or a mask over his face; may not the court order its removal in order that the witness may say whether or not he was the person whom he saw commit the crime?"

In Holt v. United States, supra, the court said: "But the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof."

The bond was voluntarily given. Where rights are availed of without objection, there is no compulsion. Czarlinsky v. United States (C. C. A. 10) 54 F.(2d) 889; Lefkowitz v. United States Attorney (C. C. A. 2) 52 F.(2d) 52. In the last-cited case, the accused wrote a letter at the request of an officer, to secure release on bail. The primary purpose of the officer was to obtain a sample of defendant's typewriting and her signature. It was held that the provision against self-incrimination had not been infringed. We are clear that the defendant's constitutional right not to be compelled to be a witness against himself was not infringed in the instant case.

VIII. The court in its instructions, after stating that the opinion of the court on facts was not binding upon the jury, and that they should understand the court's views were merely to aid the jury in arriving at its own conclusion, and that the jury was not bound in any way upon any question of fact, said: "Now, with that caution I will say to you, gentlemen, that I have listened to all this evidence as intently as you have I think, and in the opinion of the court the government has established the facts which ought to convince reasonable men beyond a reasonable doubt, and taking the evidence as a whole I think the government has established the allegations of these several counts that remain in the indictment."

This instruction is vigorously assailed as erroneous and prejudicial, and great reliance is placed upon the opinion in United States v. Murdock, 290 U. S. 389, 54 S. Ct. 223, 78 L. Ed. 381. In the Murdock Case, however, there was a serious question of whether or not the defendant had acted willfully within the meaning of the statute. The trial judge may, of course, analyze the evidence or comment upon it, and may express his views with reference thereto, always advising the jury that the decision on the issues of fact is left to the jury. In the instant case, there is no question of intent or wilfullness, and the evidence may be said to be undisputed. The expression of an opinion under such circumstances is little more than advising the jury that the facts as proved are sufficient in law to constitute the offense charged. As said by the court in Horning v. District of Columbia, 254 U. S. 135, 41 S. Ct. 53, 54, 65 L. Ed. 185: "The facts were not in dispute, and what he did was to say so and to lay down the law applicable to them. In such a case obviously the function of the jury if they do their duty is little more than formal. The judge cannot direct a verdict it is true, and the jury has the power to bring in a verdict in the teeth of both law and facts. But the judge always has the right and duty to tell them what the law is upon this or that state of facts that may be found, and he can do the same none the less when the facts are agreed. If the facts are agreed the judge may state that fact also, and when there is no dispute he may say so although there has been no formal agreement."

In the instant case, according to the undisputed evidence, a fraud has been carried on for years, and these undisputed facts constitute a violation of the statute with which the defendant was charged, and we are of the view that it was proper for the court, in its discretion, so to advise the jury. Quercia v. United States, 289 U. S. 466, 53 S. Ct. 698, 77 L. Ed. 1321; Cook v. United States (C. C. A. 8) 18 F.(2d) 50. The undisputed facts in this case can give rise to no conflicting inferences. It is impossible that any inference of innocence or honesty can be predicated upon this record, and if, as is stated in the Murdock Case, the trial judge has the power to express his opinion as to the guilt of the defendant, it would seem that this is a proper case for the exercise of that discretion.

Defendant also complains of the instruction of the court to the effect that more details were alleged in the indictment than were necessary to prove. This did not amount to an amendment of the indictment. That could only be done by action of the grand jury. Ex parte Bain, 121 U. S. 1, 7 S. Ct. 781, 30 L. Ed. 849. Disregarding surplusage, however, is not in the nature of an amendment. Ford v. United States, 273 U. S. 593, 47 S. Ct. 531, 71 L. Ed. 793.

While it is not assigned as error, the record as printed indicates that the court submitted to the jury a count that had been dismissed, and failed to submit to the jury the count that remained in the indictment. Whether the record is correct or not in this regard, we need not stop to inquire, because it must be accepted as a verity in this court, not having been corrected nor amended.

It appears that the judgment and sentence is not upon each count, but there is a combination or grouping into two sentences, one on counts 1, 2, 3, and 4, and the other on counts 5, 6, 7, 10, 11, 13, 14, and 15. After the five-year sentence on the first group has been served, the five-year sentence on the second group is to be effective. In other words, a concurrent sentence is made as to counts, 1, 2, 3, and 4, and a concurrent sentence as to the other counts. The sentence on these combined offenses does not exceed that which could have been imposed on any one of the counts included, and hence the error with respect to one of the counts is without prejudice and may be disregarded. Busch v. United States (C. C. A. 8) 52 F.(2d) 79; Dickerson v. United States (C. C. A. 8) 20 F.(2d) 901; Brooks v. United States, 267 U. S. 432, 45 S. Ct. 345, 69 L. Ed. 699, 37 A. L. R. 1407.

We have considered all the other alleged errors, but are of the view that they present no substantial question or prejudicial error. The defendant in this case has been ably de-

fended; he has been accorded a fair trial by the lower court; and has been found guilty by the jury. The record conclusively establishes his guilt beyond all peradventure of doubt. What was said by this court in Smith v. United States (C. C. A. 8) 267 F. 665, 670, is here apposite. We there said: "The evidence of the guilt of these defendants was so conclusively established that, even if there had been some error in the admission of evidence, and we do not hold that there was, the modern law so clearly stated by Judge Hook in Williams v. United States (C. C. A.) 265 F. 625 (opinion filed April 29, 1920), applies. Judge Hook there said: 'Whether prejudice results from the erroneous admission of evidence at a trial is a question that should not be considered abstractly or by way of detachment. The question is one of practical effect, when the trial as a whole and all the circumstances of the proofs are regarded. * * * It is manifest that he was not prejudiced by the admission of the testimony to which reference has been made.'"

Convinced as we are that no injustice has been done this defendant, the judgment appealed from is affirmed.